**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2009-CA-01441-SCT**

*KEVIN BERRY*

*v.*

*ORA L. PATTEN, AS NEXT FRIEND OF BIANCA
PATTEN, SHADARRYL HARDNETT AND
MARIAH PATTEN*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/06/2009 |
| TRIAL JUDGE: | HON. HENRY L. LACKEY |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | L. CARL HAGWOOD |
| | MARY FRANCES STALLINGS-ENGLAND |
| ATTORNEY FOR APPELLEES: | WILLIAM C. WALKER, JR. |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND RENDERED -12/16/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1. Sheila Patten, who was being prepared for surgery by Kevin Berry, a Certified Registered Nurse Anesthetist (CRNA), aspirated stomach fluids into her lungs, leading to her death several weeks later. At issue in this wrongful-death suit is whether the plaintiff produced sufficient evidence that Berry breached the standard of care required of a CRNA. Because she did not, we reverse.

**I. BACKGROUND**

*Factual Background*

¶2.     Sheila Patten underwent gastric-bypass surgery at Baptist Memorial Hospital in Oxford, was discharged to go home, but returned to the emergency room late the following night, complaining of abdominal pain, nausea, vomiting, and mild shortness of breath. Dr. Mickey King, the surgeon on call, diagnosed her with a small-bowel obstruction – a known complication of gastric bypass surgery – and admitted her to the hospital. The following morning, Dr. King's partner, Dr. James Robert Barnes, examined Sheila and scheduled her for exploratory surgery later that day.

¶3.     Dr. Keith Roller, a board-certified anesthesiologist, performed a pre-anesthesia evaluation, and developed an anesthesia care plan calling for general anesthesia with rapid-sequence induction – a method involving a sedative, quickly followed by injection of a paralytic drug, cricoid pressure (pressure on the cartilage around the trachea to open the airway), and intubation (the insertion of a tube into the trachea to maintain an open airway). Dr. Roller's anesthesia plan did not call for use of a nasogastric tube (NG tube).

¶4.     In some surgical procedures, an NG tube is inserted through the nose into the stomach to remove the stomach's contents, reducing the risk that the patient will aspirate (regurgitate, and then breathe into the lungs) the stomach's contents. However, because of the risk that an NG tube could rupture the sutures or staples in the stomach, allowing the stomach contents and blood to leak into the peritoneal cavity, both Dr. King and Dr. Barnes strictly prohibited the use of NG tubes on patients following gastric-bypass surgery; and as an extra precaution, they had notations placed on these patients' patient cards prohibiting the use of NG tubes.

¶5.    At the time Sheila's surgery was to begin, the hospital – according to its normal procedure – had a CRNA in each of its six or seven active operating rooms, all supervised by three anesthesiologists. Sheila's CRNA, Berry, was supervised by Dr. Fredrick Jones, who was not in the operating room when Berry began to prepare Sheila for her procedure.

¶6.    Sheila was placed on the operating table, the paralytic drug was administered, and a nurse applied cricoid pressure. When Berry noticed fluid coming from Sheila's nose, indicating her stomach contents were coming up, he put a tube down into her lungs and forced air through it, while a nurse called for help. Dr. David Huggins, an anesthesiologist who was not on call, happened to hear the call for help and immediately responded, arriving slightly before Dr. Jones.

¶7.    Finding no problem with Sheila's vital signs, breathing, or airways, Dr. Huggins performed a pulmonary lavage to flush her lungs with saline solution, and then placed an arterial line. With the help of a ventilator, Sheila began breathing again, and Dr. Barnes proceeded with the surgery, clearing the small-bowel obstruction.

¶8.    Following the surgery, Sheila was placed in a coma and remained in the intensive-care unit for about a week. When her kidneys began to fail, she was transferred to a Tupelo hospital and she began to improve, allowing the doctors to remove the ventilator and begin dialysis. But after several weeks of treatment, she died.

*Procedural Background*

¶9.    Sheila's mother, Ora Patten – on behalf of Sheila's three children – filed a wrongful-death suit against the hospital,[1] Dr. Barnes, Dr. Jones, and Berry. Before trial, the hospital

---

[1] Baptist Memorial Hospital, North Mississippi, Inc.

3

and Dr. Barnes were dismissed from the suit. Following the trial, the jury returned a defense verdict for Dr. Jones, but found for the plaintiffs against Berry, awarding damages of $1,150,000.

¶10. Berry filed a Motion for Judgment Notwithstanding Verdict, Motion for a New Trial or, Alternatively, Motion for Remittitur, suggesting the following errors:

- the jury's verdict was improper and erroneous as a matter of law against the overwhelming weight of the evidence;

- jury instruction P-6A did not conform to Mississippi law on negligence, in that the instruction used terms that do not exist in medicine and cannot be found in the record;

- the trial court erred in allowing the jury to consider damages when heirship had not been determined and to consider damages for the minors when no guardian had been appointed;

- the trial court erred in allowing the jury to consider damages for funeral expenses, net present cash value and survival claims, as the plaintiffs lacked capacity to claim these elements of damages;

- the trial court erred in allowing the reading of Dr. Richard Mackey's deposition in its entirety;

- the trial court erred in striking Juror 26, Bradley S. Knight, and inserting Juror 27, Sheila R. Tyson, in his place when Juror 19, Louann Hood, became ill; and

- the trial court erred in denying the defendant's requested jury instruction, D-15, when the plaintiffs' expert witness, Dr. James Futrell, affirmed, "These deviations caused a missed opportunity to prevent and/or limit the occurrence of the aspiration that followed."

¶11. The trial court denied Berry's post-trial motion and he appealed, raising the issues listed above.

## II. ANALYSIS

4

¶12.    Because Berry's first two issues – which we analyze as a single issue – are dispositive, we decline to address the others.

*Standard of Review*

¶13.    Berry's first two assignments of error, read together, claim that the plaintiff's standard-of-care instruction was an improper statement of the law, and that the plaintiff produced insufficient evidence to establish that he breached the applicable standard of care. Berry's claim essentially challenges the trial court's denial of his motions for directed verdict[2] and for judgment notwithstanding the verdict(JNOV), both of which required "the trial court to test the legal sufficiency of the evidence supporting the verdict, not the weight of the evidence."[3]

¶14.    When a trial court denies these dispositive motions, and the issue is appealed here, our standard of review requires us to

> consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence.  If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render.  On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.  The above

---

[2] ***River Region Med. Corp. v. Patterson***, 975 So. 2d 2005, 207 (Miss. 2007) (citing ***Twin County Elec. Power Ass'n v. McKenzie***, 823 So. 2d 464, 468 (Miss. 2002)) ("In reviewing denials of motions for judgment notwithstanding the verdict, this Court uses the same standard as for motions for directed verdict.").

[3] ***Wilson v. Gen. Motors Acceptance Corp.***, 883 So. 2d 56, 63 (Miss. 2004) (citing ***Tharp v. Bunge Corp.***, 641 So. 2d 20, 23 (Miss. 1994)).

standards of review, however, are predicated on the fact that the trial judge applied the correct law.[4]

¶15. Our analysis begins with a review of the jury instruction that set out the standard of care to be applied to Berry.

*Jury Instruction P-6A*

¶16. The trial judge, rejecting the plaintiff's proposed standard-of-care instruction, stated:

> Now, during the break see if you gentlemen can get together and come up with an instruction on the standard of care, a little more definite statement of it. Let's see what we can do, okay.

¶17. Following the lunch break, plaintiff's counsel – after announcing that the lawyers "didn't agree on drafting anything together" – presented the following instruction:

> This Court instructs the jury that the applicable standards of care alleged by Plaintiff are as follows:
>
> (1)    Utilization of an NG tube;
> (2)    Fiberoptic induction;
> (3)    Presence of an anaesthesiologist in the OR at the time of induction;
> (4)    Use of the Trendelenburg position before induction;
> (5)    Use of the Trendelenburg position after the beige fluid was seen and before intubation;
> (6)    Suctioning immediately after intubation rather than beginning ventilation.
>
> Therefore, if you find the standard of care to be any of the above and you further find that such standard of care, if any, was breached and that such breach proximately caused Sheila Patten's death, then you must find for Plaintiff and against any Defendant who you find breached the standard of care.

---

[4] ***Twin County Elec. Power Ass'n v. McKenzie***, 823 So. 2d 464, 468 (Miss. 2002) (citing ***Alpha Gulf Coast, Inc. v. Jackson***, 801 So. 2d 709, 720 (Miss. 2001)).

¶18.    Over Berry's objection, the trial court agreed to give this instruction, which failed to inform the jury of the burden of proof, failed to distinguish which alleged standard of care applied to which defendant (one an anesthesiologist, and the other a CRNA), and failed to relate the general phrases – "utilization of an NG tube" and "fiberoptic induction" – to the facts or the defendants. As one example of potential misuse of the instruction, the jury easily could have concluded that the "standard of care" required use of an NG tube, and because Berry did not use one, that he breached the standard of care. This conclusion – justified under the instruction – ignores the undisputed facts that use of an NG tube was not included in the anesthesia plan, and that Berry was prohibited by the surgeon from using an NG tube.

¶19.    Also, the first two items alleged to be "standards of care" were not only so general that they provided little help to the jury, but, as to Berry, they were conflicting. The general statement "utilization of an NG tube," standing alone, is hardly a standard of care. And as established by the plaintiff's own expert, these two alleged "standards of care" are in fact techniques used in entirely different anesthesia procedures. So if they both were "applicable standards of care alleged by Plaintiff," then the plaintiff, through the instruction, alleged that both should have been done – a position not supported by any expert testimony.

¶20.    In discussing general anesthesia with rapid-sequence induction – the anesthesia plan ordered by Dr. Roller – the parties disagreed on whether an NG tube should have been used. But no one – including the plaintiff's expert – alleged "fiberoptic induction" should have been used for the kind of anesthesia plan provided for Berry.

¶21.    And conversely, "fiberoptic intubation" (according to plaintiff's expert) is used in an entirely different anesthesia plan, "in those situations where to paralyze the patient would

7

present the dangers that have now been presented." But "use of an NG tube" and "fiberoptic induction" could not both have been the standard of care for Berry because, regardless of which anesthesia plan was followed, one of the standards of care would have been breached.

¶22. All of that said, this case must be reversed, because the plaintiff failed to produce expert testimony that Berry had breached any of the six alleged standards of care.

## 1. Use of an NG Tube

¶23. The surgeons prohibited the use of an NG tube on patients (such as Sheila) who had undergone gastric-bypass surgery. In fact, Sheila's surgeon, Dr. Barnes, placed the following notation on her patient-information card: "Under no circumstances can this patient ever have a nasogastric tube placed." Dr. Roller – the anesthesiologist who prepared the anesthesia plan – did not include in the plan the use of an NG tube, and there is no evidence in the record that Berry deviated from the anesthesia plan.

*Dr. Richard Mackey*

¶24. Dr. Richard Mackey, an anesthesiologist, provided the following testimony concerning the use of an NG tube:

> Q. Did Dr. Barnes have a . . . rule or unwritten rule pertaining to the use of NG suction on a post gastric bypass small bowel obstruction?
>
> A. Yes. That's not necessarily an unwritten rule. That may actually be a standard of care, that we don't — if we know a person has had a gastric bypass procedure, that we do not — particularly a [Roux-en-Y] procedure, that we do not put an NG tube down.
>
> Q. Okay. Now, if the surgeon . . . believed that necessary to be done, would he order that and then supervise the NG suction?
>
> A. Right.

8

Q. Okay. So as a rule, you wouldn't do it until the surgeon asked for it or ordered that?

A. Right. Correct.

Q. In the specific scenario of a post [Roux-en-Y] gastric bypass who came back with a small bowel obstruction?

A. That is right.

. . .

Q. But you're not going to say, "Well, whatever you say, Doc" . . . to the surgeon?

A. Right.

Q. Because you have your own independent responsibility to protect the patient from a catastrophic event, correct?

A. Correct.

Q. And so the anesthesiologist would be the one who would need to participate in the sort of discussion with the surgeon because of the difficulty of the situation?

A. Right.

¶25. Keeping in mind that the appellant before us is Berry, a CRNA, this expert testimony establishes only that the surgeons prohibited use of NG tubes following gastric bypass surgery, and exceptions to the rule could be made only where an anesthesiologist had discussed the problem with the surgeon – which did not happen in this case. And since Berry is a CRNA, not an anesthesiologist, this testimony has no application to him.

*Dr. James Futrell*

¶26. The plaintiff also called Dr. James Futrell, an anesthesiologist from Los Angeles, who agreed that the placement of an NG tube in post-gastric-bypass patients poses a risk of

rupturing the surgical site, but testified that, in his opinion, not placing an NG tube poses a greater risk of aspiration. Dr. Futrell disagreed with Dr. Barnes's assessment that Sheila should *never* have an NG tube, and he stated that the anesthesiologist responsible for Sheila's care should not have agreed to such a restriction:

> Q. I want you to assume for me that her surgeons in this case had instructed the anesthesiologist never to pass a nasogastric tube. I want you to make that assumption for me. I want you to further assume that the anesthesiologist considered the request of the surgeons and formed an independent medical judgment as [an] anesthesiologist[] that this was a valid medical request; and that they themselves were of the opinion that a nasogastric tube should not be placed in this type of patient. Making those assumptions, are you now of the opinion that Dr. Jones or Kevin Berry or any of the other anesthesiologists were neglect? [*sic*] . . . Doctor, making those assumptions, first, are the surgeons negligent in your opinion and is the anesthesiologist for forming this medical judgment and recommending this to the anesthesiologist?

> A. I think that any physician who would make such a statement as to "never" and to state that under no circumstances should a patient ever have a nasogastric tube, and to have an anesthesiologist responsible for that patient's life, and for that patient's airway, giving that patient dangerous paralytic drugs, to agree to that is a breach of the standard of care.

¶27. While this testimony does allege that Dr. Barnes breached the standard of care by ordering that an NG tube was "never" to be placed, and that Dr. Jones, the anesthesiologist, breached the standard of care by agreeing to that order, it falls far short of establishing that Berry, a CRNA, breached the standard of care by following Dr. Berry's anesthesia plan, or by following the surgeon's orders not to place an NG tube. Moreover, Dr. Futrell testified that even had an NG tube been placed, it would not have been Berry or Dr. Jones who would have placed it:

Q. Doctor, let's continue on. I think one of the things that you've testified to was that the anesthesiologist could have conferred with the surgeon over the placement of the NG tube, correct?

A. Yes, should have.

Q. And you believe should have. In fact, the anesthesiologist, I believe you testified to in your deposition, should have called the surgeon down and said, "You place the NG tube."

A. Exactly.

¶28. Dr. Futrell later testified:

Dr. Jones is the anesthesiologist who is the attending and responsible physician, and it was his responsibility to preoperatively evaluate this patient after Dr. Roller and before, immediately before the induction of anesthesia and to be in the room with the patient to manage this patient along with the nurse anesthetist, Berry; and that is the breach of the standard of care; and that is the anesthesiologist who is responsible.

¶29. So the most Dr. Futrell's testimony established was that the anesthesiologist, Dr. Jones, had a duty to summon Dr. Barnes and request him to place the NG tube, and that Dr. Jones bore the responsibility to be in the room with Berry, and that Dr. Jones breached the standard of care. The jury, in returning a verdict for Dr. Jones, rejected Dr. Futrell's opinion.

¶30. According to the record before us, no expert established that the standard of care applicable to Berry required "utilization of an NG tube," or that Berry had breached any standard of care with regard to the non-use of an NG tube.

2. **Fiberoptic Induction**

¶31. The second "standard of care" listed in the jury instruction was simply "fiberoptic induction." Berry correctly points out that "fiberoptic induction" is not a term that exists in medicine and does not describe any recognized medical procedure. This is not in dispute;

11

plaintiff's counsel admitted that he incorrectly included the term in his proposed instruction – the correct term was "fiberoptic intubation"[5] – and suggests that this error might have been "confusing" to the jury, except that counsel "pointed out" the error to the jury during closing argument. But counsel's closing argument is not evidence,[6] and there was, therefore, insufficient evidence to support a jury instruction alleging the standard of care to be "fiberoptic induction."

¶32. Even were we to accept appellees' argument that the jury was adequately instructed on "fiberoptic intubation," there was no evidence to support a verdict against Berry on this "standard of care." Dr. Futrell provided the only testimony regarding fiberoptic intubation, and the entirety of that testimony was as follows:

> The other thing is that anesthesiologists, board certified anesthesiologists, know of and are regularly trained and have been so for 10 or 15 years about the technique of fiberoptic intubation. This is a situation where when you know that there are existing dangers to giving a patient a paralyzing drug so that you only have seconds in order to find the proper connection to the lungs rather than do that, rather than to paralyze the patient and run that risk, what we do is simply use anesthetic agents, spray anesthetic agents to numb the mouth and a little bit of a sedative medication to sedate the patient just a little bit; but the patient is breathing on her own and has all of her reflexes and has muscular control.
>
> Under those circumstances using a fiberoptic light, which is a very thin device, much thinner than the wire to this microphone, that you can pass through and you actually move it and flex it, and you can pass this after anesthetizing the patient's nose and mouth into a breathing patient's mouth and pass it down into the breathing area into the trachea and slide the breathing

---

[5] In the appellee's brief, counsel stated: "Appellee's attorney readily admitted and cured the confusion that he was the idiot who put 'induction' in that section when in fact 'intubation' was the word that should have been used."

[6] *Mariner Health Care, Inc. v. Edwards*, 964 So. 2d 1138, 1163 (Miss. 2007) (civil cases); *Henton v. State*, 752 So. 2d 406, 409 (Miss. 1999) (criminal cases).

tube over it and below the cuff up and have complete airway control even though the stomach is full.

This fiberoptic technique is well known. It has been well taught, and in circumstances like this it is part of the standard of care in those situations where to paralyze the patient would present the dangers that have now been presented.

¶33. This testimony – specifically referring to anesthesiologists – is wholly insufficient to establish a standard of care applicable to Berry. At most, Dr. Futrell opines that the standard of care for *anesthesiologists* requires the use of fiberoptic intubation. Berry is not an anesthesiologist. So this second "standard of care" erroneously allowed the jury to hold Berry responsible for a standard of care that, under the evidence, was inapplicable to him.

### 3. Presence of an Anesthesiologist in the OR at the Time of Induction

¶34. To support a verdict against Berry for breach of this "standard of care," the plaintiff was required to produce expert testimony that Berry should not have proceeded to carry out the anesthesia plan until an anesthesiologist was in the room. In that regard, Dr. Futrell was asked: "Would you comment on whether or not starting this case with only a CRNA present is a deviation from accepted practice?" Rather than answering the question directly, Dr. Futrell began to explain the method used by hospitals to classify patients based on the severity of their conditions. In the process, a dispute arose between the parties as to whether Dr. Futrell was testifying to facts outside his knowledge (or misrepresenting the record) when he stated that Berry had classified Sheila as a Class III patient.[7] After concluding that it was Dr. Roller who had classified Sheila, the following discussion took place:

_____

[7] Sheila's ASC classification does not appear to be relevant to Kevin Berry's duties toward her. No further mention is made of ASC classification.

13

Q. Is there anything else about not having an anesthesiologist present at the time of induction? How would the presence of an anesthesiologist along with the CRNA make a difference?

A. It would make a difference in this circumstance because knowing the condition of the patient and knowing about the possibility of the gastric contents getting into the lungs as we have already discussed, it's important to have another set of hands, first of all, to be able to manage suction and intubation, putting the tube into the lungs at the same time.

This is very messy, and you don't have a lot of time, and so in these circumstances where you can anticipate we commonly call another person in to help with the situation. It's not absolutely mandatory that we do so, but prudent anesthesiologists do that.

¶35. This testimony says nothing of the standard of care required of Berry, and even assuming that "not absolutely mandatory . . . but prudent" is sufficient to establish a standard of care, Dr. Futrell was clearly testifying as to the duties of an *anesthesiologist*, not a CRNA.

### 4. Use of the Trendelenburg Position Before Induction

¶36. Item 4 in Jury Instruction P-6A read: "Use of the Trendelenburg position before induction." The entirety of Dr. Futrell's testimony regarding the Trendelenburg position is as follows:

I mentioned the need for a nasogastric tube, and I mentioned the need to be sure that because of the prior surgery it was placed appropriately and carefully so as not to cause a perforation and yet provide for the elimination of the dangerous fluids that were in the stomach.

That circumstance should be associated with an understanding of what happened and the position that the patient was in knowing that the nasogastric tube was not used and knowing that the stomach was full of fluids. Then the next appropriate thing that should have been done was that the patient should have been placed in the Trendelenburg position, which is a position where the patient, the bed, the operating table is moved and adjusted electrically such that the patient's head is lower than the patient's stomach.

14

In that circumstance, knowing that the patient has something in their stomach, and in an emergency situation without a nasogastric tube, knowing that you have to paralyze the patient, if those fluids, as they did, present themselves, water runs downhill and does not run uphill; and so since the head is a little lower than the stomach, even if that fluid presents itself during the period of time where the patient has to be paralyzed, that fluid will not run into the lungs; and the anesthesiologist or the nurse anesthetist can get the breathing tube in without contaminating the lungs with this, which is essentially liquid bowel contents is what they are, into the lungs.

¶37. Dr. Futrell's use of the passive voice makes his testimony unclear, especially when considered together with the fact that another nurse and others were actually present with Berry at the time of induction, and that Dr. Futrell had opined that an anesthesiologist should have been present. In other words, Dr. Futrell offered no opinion as to who was responsible for making sure the patient was placed in the Trendelenburg position. He provided no testimony that the standard of care required Berry, as opposed to someone else, to put Sheila in the Trendelenburg position, or that he had breached the standard of care in this regard.

**5.    Use of the Trendelenburg Position After the Beige Fluid was Seen and Before Intubation**

¶38. This item in Instruction P-6A apparently is drawn from testimony of Berry's expert witness, Dr. Claude Brunson, who gave the following testimony on cross-examination:

Q.    But you do train them, if they see fluid coming, to put them in Trendelenburg after they see the fluid; is that correct?

A.    Yes, that's one of the things we tell them is put their heads down and suction the fluid out. What that does is whatever is around it gets into a particular place so we can suction it all out.

Q.    In this case the patient should have been put in Trendelenburg because everybody who notes in the record that this brown fluid comes out her nose, correct?

15

A.      Yeah. That would be something to think about is putting her in Trendelenburg. We would teach them in that circumstance put them in a head down position, suction it out; and immediately as soon as you can intubate them. That's going to keep something from going into the trachea. We need to get the endotracheal tube and the cuff up.

Q.      You teach them when you see the brown stuff coming out, put them in Trendelenburg and suction.

A.      Yes.

Q.      And then intubate?

A.      You suction the fluid out and put the tube in immediately.

Q.      Thank you, Doctor. If that didn't happen, that would be a deviation from accepted practice, wouldn't it, Doctor?

A.      You know—

Q.      Can you answer that question directly yes or no, and then explain?

A.      Well, it wouldn't necessarily be a deviation from the standard of care. The reason why is you've got a trained professional there assessing everything that's going on. They are seeing fluid come back. They can put the patient in Trendelenburg and suction it out and put the endotracheal tube in. It depends on how quickly things happen in that finite period of time as you are making a quick medical decision about what is best for your patient. So when you are asking about you should do this, this, and this every time one hundred percent of the time in this circumstance on a patient, then you are taking away the provider's ability to make quick judgment that the patient needs to have made.

¶39. This testimony is insufficient to establish that Berry breached the standard of care. Neither Dr. Brunson nor any other expert offered any opinion that he did. Also, even if the testimony establishes a standard of care, it does not state whose duty it was in this particular instance to put the patient in this position.

**6.**      **Suctioning Immediately After Intubation Rather than Beginning Ventilation**

16

¶40. None of the expert witnesses discussed "ventilation" in these terms. After carefully reviewing the transcript, it appears likely this instruction was based on the following testimony from Dr. Futrell:

> The first thing to do then, if you have time in such a circumstance where you now know that aspiration of content has occurred, is to attempt to suction some of that fluid out of lungs before you give the first breath because when you give the first breath, you are going to push air into the lugs; and you are going to push all of that fluid and contents deep into the lung fills where it cannot be suctioned where it can do all the bad things we already discussed.
>
> That was not done; and so since that was not done, then the opportunity — and it's something that can be done in a few seconds; and if the oxygen saturation or oxygenation of the patient is too low, you may not have time to do it because you are about to lose the patient; but because of the testimony that the oxygenation was not that low, there was time to do it in my opinion; and it was not done; therefore, even as to the amount of fluid and bowel contents that were allowed to get into the lungs, there was an opportunity missed there to decrease that amount of fluid.

¶41. Based on this testimony, it seems that item 6 in Instruction P-6A suggested that the standard of care required that, once the patient was intubated, the aspirated fluid be suctioned from the patient's lungs before beginning ventilation. But this is far from clear. The expert testimony—particularly from Dr. Futrell—made frequent reference to "suction" in the context of using an NG tube to suction out the stomach contents before induction. This is a completely different procedure, and the intended context of "suctioning" is not clear from the wording of the instruction.

¶42. For example, the following testimony, also by Dr. Futrell, also could fit within the instruction:

> Q.  So, let's be sure that we understand. The standard of care in this case, as you've testified to, was the placement of a nasogastric tube to, as you

17

> say, suction out the stomach contents followed by the placement of a fiber optic scope followed by awake intubation?
>
> A. I didn't discuss that sequence. I discussed those things that I think could have been done to prevent this deadly occurrence.

¶43. This exchange also refers to a sequence of steps involving use of an NG tube for suctioning and intubation. The wording of item 6 does not make clear which procedure is being referenced. This item therefore renders the instruction vague and confusing, especially in light of the fact that the instruction uses a technical medical term ("ventilation") which was not used or defined by any expert witness nor by other jury instructions.

## CONCLUSION

¶44. This lawsuit appears to have been aimed at Dr. Jones, the anesthesiologist, who obtained a defense verdict from the jury. In fact, the plaintiffs proposed a jury instruction that would have allowed the jury to hold Dr. Jones vicariously liable for Berry's negligence, if any. This theory is reflected in the plaintiffs' examination of expert witnesses where the questions and answers were focused on the duties of anesthesiologists. No expert ever testified that Berry had failed to meet the standard of care of a minimally competent CRNA.

¶45. After careful review of the record, we find the trial court erroneously denied Berry's motion for directed verdict, and for judgment notwithstanding the verdict. Plaintiffs in a medical-malpractice action must establish through expert testimony not only the relevant standard of care, but the manner in which the defendant breached it. In this case, the plaintiffs failed to establish through expert testimony a CRNA's standard of care, or that Berry had breached it. Accordingly, the judgment of the Circuit Court of Lafayette County is reversed and rendered.

¶46.   **REVERSED AND RENDERED.**

   **WALLER, C.J., CARLSON AND GRAVES, P.JJ., RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**