KING, Justice, for the Court:
¶ 1. In 1998, Barbara Lanier’s two-year-old son Darrell Gill Jr. died while being treated at the University of Mississippi Medical Center (UMC). Lanier filed a complaint against UMC alleging medical malpractice and wrongful death. In 2008, the case was resolved by bench trial in the Hinds County Circuit Court with a verdict in favor of Lanier of $250,000. UMC appeals, raising four issues for this Court’s review:
I. Whether the trial court erred by denying UMC’s motion for summary judgment based on the statute of limitations.
II. Whether the trial court erred by denying UMC’s motion for directed verdict.
III. Whether the verdict was against the overwhelming weight of the evidence.
IV. Whether the trial court erred by granting Lanier’s motion to conform the pleadings to the evidence.
We find that the trial court erred by denying UMC’s motion for a directed verdict. Because we reverse and render the case on this issue, the remaining issues are moot.

FACTS AND PROCEDURAL HISTORY

¶ 2. Darrell was born January 9, 1996. That summer, he was diagnosed with a rare genetic disorder — Chediak-Higashi Syndrome (CHS). CHS is characterized by neurological and bleeding disorders that ultimately affect the organs and com *1199 promise the immune system, leaving its victims susceptible to life-threatening infections. In eighty-five percent of children, the condition advances to “the accelerated phase,” which is terminal. Five characteristics of the accelerated phase are fever, enlarged liver and spleen, hemopha-gocytosis, low fibrogen levels, and pancy-topenia. An enlarged spleen, also known as splenic sequestration, occurs when red blood cells are sequestered (trapped) in the spleen, causing it to become large and tender. Splenic sequestration causes a rapid drop in hemoglobin and prevents blood from flowing to the rest of the body. Children diagnosed with CHS typically succumb to infection, organ failure, and other complications.
¶ 3. Darrell’s condition had reached the accelerated phase. Over the course of his life, Darrell was hospitalized fifteen times, staying in the hospital approximately 150 days. He had frequent fevers. His spleen was swollen on several occasions. He had experienced severe neurological deterioration, leaving him unable to communicate, walk, and sit up on his own. He also had seizures and was prescribed topiramate (brand name Topomax), an anticonvulsant medication. According to Darrell’s prescription, he was to receive two 25-milli-gram pills, three times a day (a total of 150 milligrams per day).
¶ 4. Darrell had a scheduled doctor’s appointment on August 27, 1998. When he arrived at UMC, he had a 102-degree fever and, thus, was admitted to the hospital. According to medical records, the treating doctor noted that Darrell's spleen was palpable. At approximately 9:00 p.m., a nurse administered Darrell’s seizure medication, giving him a 200-milligram dose.[1]
¶ 5. Lanier testified that, thereafter, Darrell became lethargic and had problems breathing. She contacted the nurse, and Darrell was rushed to the pediatric (intensive care unit. Doctors were unsuccessful in their attempts to resuscitate Darrell, and he was later pronounced dead on August 28, 1998, at 12:55 a.m. The autopsy report listed the cause of death as “acute splenic sequestration crisis secondary to the accelerated phase of Chediak-Higashi Syndrome.”
¶ 6. Lanier mailed a notice-of-claim letter, which was dated July 15, 1999, to UMC and subsequently filed her complaint, alleging medical malpractice and wrongful death, on January 14, 2000. Several years passed with little action in the case. Then in 2008, Lanier produced the proof of delivery for her notice-of-claim letter, which showed that the notice-of-claim letter was not delivered until September 22, 1999. UMC moved to dismiss the action, claiming Lanier’s claim was barred by the statute of limitations. But the trial court found that UMC had waived its affirmative defense by participating in litigation and, thus, denied the motion.
¶ 7. Before the bench trial, UMC stipulated that it had breached the standard of care by giving Darrell an incorrect dosage of topiramate. According to the pretrial order, the sole issue at trial was whether Darrell had died as a result of the dosage error or from complications related to CHS.
¶ 8. The plaintiffs expert Dr. Rodrigo Galvez, a pathologist and psychiatrist, testified that, because Darrell’s health had deteriorated rapidly after taking the topi-ramate, the drug directly caused his splenic sequestration and ultimate death. *1200 Because this testimony is central to the leading issue in this case, we will discuss Dr. Galvez’s testimony below in greater detail.
¶ 9. Dr. Laurence Boxer, an expert in ■. pediatric hematology and oncology, testified for UMC. Dr. Boxer also is an expert in Chediak-Higashi Syndrome, conducting extensive research in the area, publishing several studies and textbook chapters, and personally treating three CHS patients. Dr. Boxer testified to a reasonable degree of medical probability that Darrell had died of splenic sequestration, a condition directly related to CHS. According to Dr. Boxer, no literature suggested that topira-mate could cause splenic sequestration or an abrupt drop in hemoglobin. Although the Physician’s Desk Reference listed death as a rare side effect of topiramate, Dr. Boxer stated that this percentage was “no higher than patients with a noted history of epilepsy dying and having sudden death with other drugs.” Thus, Dr. Boxer attributed Darrell’s death to the accelerated phase of CHS. Against UMC’s objection, Dr. Boxer also was allowed to testify that the treating doctor erred by not checking Darrell’s spleen sooner.
¶ 10. Dr. David Stafford, the defendant’s expert forensic toxicologist, testified that topiramate is a relatively mild drug, and, although Darrell’s dosage was higher than prescribed, it was not necessarily an overdose. He could find neither a study that established a toxic dose for topira-mate nor a reported death due to an overdose — even where patients took 1600 to 4000 milligrams of the drug. Dr. Stafford opined that, if Darrell had been affected adversely by the topiramate, he would have had high levels of chloride and carbon dioxide in his system, which he did not. Additionally, Dr. Stafford stated that he did not find any literature which suggested that topiramate could cause splenic sequestration. Based on a reasonable degree of medical probability, Dr. Stafford opined that the topiramate did not cause Darrell’s death.
¶ 11. After the defense rested, Lanier moved to amend the pleadings to conform to the evidence based on Dr. Boxer’s testimony that the treating doctor had failed to properly examine Darrell. UMC objected, but the trial judge granted the motion. On December 13, 2010, the trial court ruled in favor of Lanier, finding that “but for the incorrect dosage of [tjopiramate and the subsequent failure of Dr. Iyer to find splenic sequestration upon an exam, Darrell would not have died.... ” Aggrieved, UMC timely filed its notice of appeal with this Court.

ANALYSIS

¶ 12. This Court reviews the grant or denial of a motion for a directed verdict de novo. McGee v. River Region Med. Ctr., 59 So.3d 575, 578 (¶8) (Miss.2011). A motion for directed verdict chal lenges the legal sufficiency of the evidence. Id. In ruling upon a motion, the Court must look solely to the testimony provided by the nonmoving party, reviewing the evidence in the light most favorable to the nonmoving party and giving that party the benefit of all favorable inferences that reasonably may be drawn from the evidence. Id. If the evidence presented creates a question of fact upon which reasonable minds could differ, then the motion for directed verdict should be denied. Id.
¶ 13. UMC argues that the trial court erred by denying its motion for directed verdict for three reasons: (1) Dr. Galvez was not qualified to testify, (2) his opinion had no basis, and (3) he failed to provide his opinions to a reasonable degree of medical probability. Lanier argues that Dr. Galvez was a qualified expert, and he *1201 established causation within a reasonable degree of medical probability.
¶ 14. A plaintiff must prove four factors to make out a prima facie case of medical negligence:
(1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant’s breach of duty was a proximate cause of the plaintiffs injury, and (4) the plaintiff was injured as a result.
Univ. of Miss. Med. Ctr. v. Gore, 40 So.3d 545, 552 (¶27) (Miss.2010) (citation omitted). As previously noted, UMC stipulated that it had breached its duty to Darrell by giving him an incorrect dosage of topiramate. Thus, Lanier only had to prove causation.
¶ 15. Generally, causation must be proven by expert medical testimony. Estate ex rel. Campbell v. Calhoun Health Serv., 66 So.3d 129, 136 (¶ 32) (Miss.2011). This Court reviews the trial court’s admission or exclusion of expert testimony for an abuse of discretion. Worthy v. McNair, 37 So.3d 609, 614 (¶ 13) (Miss.2010). Absent an abuse of discretion, the trial court’s determination as to an expert’s qualifications will remain undisturbed on appeal. Id. The trial court must determine whether expert testimony is admissible under Daubert[2] — (1) the expert testimony must be relevant, meaning that it will aid the fact-finder, and (2) the expert testimony must be reliable. Worthy, 37 So.3d at 614 (¶ 13). Mississippi Evidence Rule 702 further provides that:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Id. (citing M.R.E. 702).
A. Dr. Galvez’s Qualifications
¶ 16. The trial court accepted Dr. Gal-vez as an expert in the field of forensic pathology. By profession, Dr. Galvez is a retired psychiatrist, having begun his training in the late 1970s, and a retired pathologist, supervising or observing more than 4,000 autopsies during his career. During his coursework, Dr. Galvez took an elective in forensic pathology, but he failed the forensic pathology boards. Thereafter, he specialized only in clinical and anatomical pathology.
¶ 17. Ninety-nine percent of his forensic exams stemmed from criminal cases, and ninety percent of those cases involved determining the cause of death for gunshot victims. Besides preparing for this case, Dr. Galvez had no knowledge or experience with Chediak-Higashi Syndrome. But Dr. Galvez had experience with topira-mate, as he had prescribed it to several psychiatry patients. He stated that he mainly had used the drug to calm down “agitated patients,” not as an anticonvul-sant. Dr. Galvez admitted that he had no training in hematology, oncology, pediatrics, pharmacology, toxicology, or chemistry.
*1202 ¶ 18. UMC points out Dr. Galvez’s lack of knowledge of CHS, his failing the forensic pathology boards, and his unfamiliarity with neurology, pediatrics, or pediatric hematology/oncology. This Court has stated that “[a] physician who is sufficiently ‘familiar with the standards of a medical specialty, may testify as an expert, even though he does not practice the specialty himself.’ ” Troupe v. McAuley, 955 So.2d 848, 856 (¶ 22) (Miss.2007) (citations omitted). But the physician must be familiar with the applicable standard “by knowledge, skill, experience, training, or education in accordance with Miss. R. Evid. 702.” Id.
¶ 19. The sole issue at trial was whether Darrell’s death was a result of the topiramate-dosage error or of CHS complications. During voir dire, it appeared that Dr. Galvez had some knowledge of topira-mate and experience determining the cause of death based on autopsy results. The trial court reasonably could have believed that Dr. Galvez’s testimony would be relevant and reliable. Thus, as for Dr. Galvez’s qualifications, the Court cannot say that the trial court erred by accepting Dr. Galvez as an expert witness.
B. Dr. Galvez’s opinions were not based on a reasonable degree of medical probability.
¶ 20. The expert opinion of a doctor as to causation must be expressed in terms of medical probabilities as opposed to possibilities. Pittman v. Hodges, 462 So.2d 330, 333-34 (Miss.1984).[3] Dr. Galvez failed to testify within a reasonable degree of medical probability whether Darrell died of the topiramate or as a result of CHS complications. Dr. Galvez was totally unfamiliar with the accelerated phase of CHS, so much so that defense counsel had to explain the accelerated phase of the disease to him during cross-examination.
¶ 21. Dr. Galvez also stated several times — during direct and cross-examination — that he will never know if Darrell died of the topiramate, because there was no toxicology report. During direct examination, Dr. Galvez stated that, “If they knew that the child took an increased dose of Topomax, it was high enough to kill him or was not high enough to cause any damage. We’ll never know.” During cross-examination, he reiterated this point several times:
I said to the Court and to you I will never know if the cause of death was accelerated phase of Chediak-Higashi syndrome because they didn’t do the toxicology study that could go in one direction or the other direction.
[[Image here]]
I told you before they didn’t do the toxicology screen or level for Topomax, I will never know whether it was the cause of death, and nobody will know whether the cause of death was the accelerated phase of the Topamax intoxication.
[[Image here]]
I will repeat until I die, we’ll never know how high the level of Topomax was on this child because they didn’t do the blood test. They should have done it. And what the impact of the Topamax was to trigger the sequestration and kill the child we’ll never know because they didn’t do [it] in the autopsy and now it’s too late to do it.
*1203 ¶ 22. This Court has stated that “nothing is absolutely certain in the field of medicine, but the intent of the law is that if a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can a jury use that information to reach a decision.” Catchings v. State, 684 So.2d 591, 597 (Miss.1996). In this case, the trial court judge sat as the sole fact-finder, and was left to speculate whether Darrell died from CHS complications or the increased dosage of topi-ramate. Because Dr. Galvez’s opinion was not based on a reasonable degree of medical probability, this Court finds the testimony was not sufficient to prove causation. The trial court erred by denying UMC’s motion for a directed verdict. Thus, we reverse and render the trial court’s judgment. Because this issue is dispositive, the remaining issues are moot.

CONCLUSION

¶ 23. Although the trial court did not err by accepting Dr. Galvez as an expert, the trial court did err by denying UMC’s motion for a directed verdict. Dr. Galvez provided no basis for his opinions, and he failed to testify within a reasonable degree of medical probability that the topiramate caused Darrell’s death. Because we reverse and render the trial court’s judgment on this issue, the remaining issues are moot.
¶ 24. REVERSED AND RENDERED.
WALLER, C.J., CARLSON AND DICKINSON, P.JJ., LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ„ CONCUR. RANDOLPH, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.

. The record does not indicate whether Darrell had received any topiramate earlier that day.

. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. In Brandon HMA, Inc. v. Bradshaw, 809 So.2d 611 (Miss.2001), this Court incorrectly left the impression that it was acceptable to offer expert medical causation in terms of probability or possibility. Id. at 617 (¶ 16). Today, we take this opportunity to state with clarity that expert medical testimony as to causation must be set forth in terms of medical probability.