# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-30675

United States Court of Appeals
Fifth Circuit

**FILED**

February 27, 2014

Lyle W. Cayce
Clerk

In the Matter of:  WEST FELICIANA ACQUISITION, L.L.C.,

Debtor

-----------------------------------------------------------------------------------------------------------

AMZAK CAPITAL MANAGEMENT,

Appellant

v.

STEWART TITLE OF LOUISIANA; STEWART TITLE GUARANTY COMPANY; ADMIRAL INSURANCE COMPANY

Appellees

Appeal from the United States District Court
for the Middle District of Louisiana

Before JONES, ELROD and HAYNES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Amzak Capital Management ("Amzak") appeals the district court's grant of summary judgment on its loan loss claims against its title insurance policy provider and related entities, Stewart Title of Louisiana, Stewart Title Guaranty Company, and Admiral Insurance Company.  For the following reasons, we AFFIRM the district court's judgment.

No. 13-30675

## I.     FACTS AND PROCEEDINGS

### A. Events Prior to Bankruptcy

In April 2009, West Feleciana Acquisition, L.L.C. ("WFA") purchased a paper mill in Louisiana from its former owner, Tembec USA, LLC ("Tembec"), for $16 million and other consideration (*e.g.*, a multi-year consulting agreement). WFA consisted of two members: PanAmerican Capital Partners, LLC and Caoba Capital ("Caoba"). WFA relied heavily on the money of others to purchase the mill, including a $4 million economic-development grant from the State of Louisiana (the "State") and a $2 million loan from the State. It used that money as a down payment and signed promissory notes to Tembec for the remaining $10 million of the purchase price. The State loan and Tembec loan were secured by mortgages on the paper mill, all of which were recorded. The State's mortgage ranked first and was followed by Tembec's mortgages.

WFA contracted with Fluor Enterprises, Inc. ("Fluor") in June 2009 to operate the mill. WFA encountered operational difficulties, and Fluor left the mill in October 2009. Fluor and its subcontractors filed over $17 million in liens against the mill between September 1 and October 19, 2009. WFA terminated the Fluor contract. WFA continued to operate the mill and approached Amzak Capital Management, LLC ("Amzak"), a venture-capital firm, about a loan workout and restructuring. Meanwhile, WFA was losing money on the mill.

Amzak and WFA negotiated a credit agreement that would provide WFA a maximum of $15 million, but only if the State's $2 million loan, a prior mortgage on the mill, was paid off first. Otherwise, Amzak would lend WFA a maximum of $13 million and would charge its borrower 14% interest. The paper mill would secure the debt. Amzak's mortgage was to be junior to the State but senior to Tembec through a subordination agreement. Amzak

2

retained Stewart Title of Louisiana ("STL") as its title agent and local counsel. Amzak expected STL to draft and record the mortgage documents and to issue a $15 million title-insurance policy to Amzak. The loan closed on August 25, 2009, and Amzak disbursed $8.1 million under the credit agreement the next day. After this, Amzak's lawyer, Maria Acevedo ("Acevedo"), sent STL the "fully executed" mortgage and subordination documents for filing, which lacked an attached property description. Although the cover letter was silent, there was evidence that Acevedo told STL on the phone, days earlier, that the property description would not be included in these documents and that STL should physically attach the description to both filings. Ken Moran ("Moran"), an STL employee, claimed that he did not recall any such discussion. Moran sent the executed documents to the West Feliciana Parish Clerk of Court, who recorded them on September 1, 2009. As recorded, the documents lacked a property description.

At Amzak's request, STL sent Amzak a copy of the recorded security documents on October 7, 2009. This copy reflected that a property description was lacking. Upon learning of Amzak's dissatisfaction with the title policy and the form in which the mortgage and subordination agreement were recorded, STL revised and then re-issued a final title policy to Amzak on October 19, 2009. Amzak did not voice objection.

Amzak stopped receiving payments from WFA, which breached a covenant in the parties' credit agreement. Amzak formally put WFA in default in October 2009. Defaulting on the loan triggered penalty interest on the $12.6 million balance at the rate of 20%, which pushed WFA closer to insolvency. Fluor's liens and WFA's failure to make certain payments prompted Amzak to issue two more letters of default to WFA in November and December. No forbearance agreement was reached between WFA and Amzak.

According to Amzak, by mid-December 2009, Caoba, the majority owner of WFA, and Amzak had verbally agreed that Caoba would invest an additional $3 million to $10 million in capital in WFA through Amzak's mortgage. The ability to use Amzak's mortgage, which was believed to be valid, as the vehicle for Caoba's capital infusion was important, because Caoba assumed it had priority over the Tembec mortgage as well as any intervening liens. Caoba's capital would be secured by the mortgage but be junior to Amzak's loan. Caoba discovered the title defect in the mortgage as negotiations proceeded and backed away from making the capital infusion. In late December 2009, Caoba informed Amzak "that there are deficiencies in your mortgage that do not allow us to put money through your existing structure."

In early January 2010, Amzak submitted a written notice of claim to Stewart Title Guaranty Company ("STG"), STL's underwriter, based on the title policy. STL acknowledged the title defect and submitted the matter "to [its] claim [department] . . . because of the problem." WFA's counsel advised WFA's principals that they had a fiduciary duty to WFA's unsecured creditors to file for bankruptcy within 90 days of the October 19 recording, to preserve WFA's ability to avoid it as a preference in bankruptcy.

## B. WFA Files for Bankruptcy

In mid-January 2010, WFA filed a Chapter 11 petition in the Bankruptcy Court for the Middle District of Louisiana. WFA's debts were significant; aside from the millions it owed Amzak, its debts included approximately $2 million owed to the State for its secured senior loan, approximately $10 million owed to the Tembec entities for the acquisition of the mill, approximately $14 million in unsecured debts to assorted vendors, and an indeterminate amount to Fluor. WFA owed Amzak roughly $13.4 million in principal and interest under the credit agreement. The principal asset of WFA, the paper mill, was operating at the time of WFA's bankruptcy filing; if it shut down, the cost to restart it

would be $10 to $20 million and its value would plummet. Amzak lent WFA about $4 million more in debtor-in-possession ("DIP") financing, and WFA released any rights to challenge Amzak's mortgage. However, the mill shut down in early February 2010.

The bankruptcy court ordered a sale of WFA's assets under 11 U.S.C. § 363, including the paper mill.[1] The auction sale occurred in April 2010. Amzak became the winning bidder for $9.9 million, which it paid as follows: (i) a credit bid of approximately $4.4 million of its DIP loan; (ii) a payment in cash of approximately $2.5 million to satisfy the State's first-ranking loan; and (iii) a credit bid of $3 million of its pre-bankruptcy defective mortgage. After its purchase of the paper mill, Amzak transferred the asset to a wholly owned subsidiary, KPAQ Industries, LLC ("KPAQ"). Amzak invested over $58 million into KPAQ during a period of roughly 30 months. KPAQ fared no better than WFA and has made no profit.

*C. The Present Cause of Action*

The present action began as an adversary proceeding by Tembec in the bankruptcy case. Tembec filed a "Complaint to Determine Validity, Priority and/or Extent of Real Estate Mortgage, Security Agreement of Leases and Rents" against Amzak in August 2010. Tembec's complaint alleged, in relevant part, that the Amzak mortgage was ineffective, because it had no property description, and the mortgage act of correction was ineffective. Amzak filed its

---

[1] Prior to this sale, the Official Committee of Unsecured Creditors (the "Committee") in WFA's bankruptcy sued Amzak to have its mortgage invalidated. When the Committee's claims were heard in November 2010, WFA's bankruptcy had been converted from a Chapter 11 case (involving the Committee) to a Chapter 7 case (involving a trustee and no creditors committee). The bankruptcy court dismissed the Committee's claims because the Committee ceased to exist. The bankruptcy court also dismissed the trustee's claims asserting the rights of the Committee on the grounds (i) the trustee was bound, as WFA's successor, by WFA's release of Amzak in the DIP order, and (ii) the trustee was the successor of the debtor and not of the Committee and could not assert the rights of the Committee.

No. 13-30675

answer and third-party complaint, requesting a jury trial, against STG and STL. They answered. Amzak also filed a motion for summary judgment on all counts and prevailed. The bankruptcy court dismissed Tembec's complaint entirely and that ruling was certified as final. Tembec did not appeal.

Amzak moved to transfer the case from bankruptcy court to the district court. The district court granted Amzak's motion to withdraw the reference of the adversary proceeding. Amzak timely filed its amended third-party complaint, still requesting a jury, adding Admiral Insurance Company ("Admiral") as a third-party defendant and amending its claims and damages against STG, STL, and Admiral (collectively, "defendants"). Amzak's claims against defendants included: (a) its claim for its loan loss of $10.4 million due to the title defect and (b) its claim for reimbursement of fees and expenses of $347,668 incurred during the bankruptcy case. Its claims were grounded in breach of contract under the title policy against STG and in negligence against all defendants.

The parties filed cross-motions for partial summary judgment relating to the loan loss claim. The district court rejected Amzak's contract and negligence claims but never decided the issue of the validity or invalidity of the title of the mortgage. In May 2013, the district court entered its judgment under Rule 54(b).[2] Amzak timely appealed.

---

[2] After the district court entered this judgment against Amzak on the title claim and the negligence claim, Amzak filed a Motion to Designate Judgments Final and for Stay or Continuance of Case Pending Appeal. The remaining claim involved attorney's fees, and Amzak argued that the fees claim should be subsumed by the rulings dismissing Amzak's other claims. The district court disagreed and found that fact issues remained regarding the fees claim and the claim for statutory penalties, and as a result, the remaining claims would be stayed pending appeal.

No. 13-30675

## II.    DISCUSSION

Amzak raises three arguments on appeal.  Regarding its contract breach claim, Amzak asserts that the title insurance policy insured against the loan loss caused by the defective title of Amzak's mortgage; and a breach of the title policy occurred at the time of the loan and Amzak's loss is properly measured as of the time of the loan.  Amzak also contends that it produced sufficient evidence of causation in negligence to survive summary judgment and warrant a trial on that claim.  Like the district court, we find these arguments unavailing.

### A. *Standard of Review*

In reviewing a summary judgment, this court applies, *de novo*, the same test employed by the district court.  *In re Sanders v. United States*, 736 F.3d 430, 435 (5th Cir. 2013).  Summary judgment is proper if, viewing all evidence in the light most favorable to the non-movant, the record demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Id.*  A dispute gives rise to a genuine issue of material fact when the evidence permits a reasonable jury to return "a verdict for the nonmoving party."  *Id.* (internal citations and quotations omitted).  Summary judgment must be affirmed if it is sustainable on any legal ground in the record.  *Id.*

### B. *Amzak's Contract Claim*

Amzak's claim under its title insurance policy with STL is governed by the law of Louisiana.  As we stated in *First American Bank v. First American Transportation Title Insurance Co.*:

> Louisiana law provides that an insurance policy is a contract between the parties and should be construed using the general rules of contract interpretation set forth in the Louisiana Civil Code.  The words used in an insurance policy must be given their generally prevailing meaning.  When the language of an insurance

7

policy is clear, courts lack the authority to change or alter its terms under the guise of interpretation.  Further, each provision of an insurance policy must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.  Insurance policies should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion.

585 F.3d 833, 837 (5th Cir. 2009) (internal citations and quotations omitted).

The relevant portions of this policy are not ambiguous.  STL insured Amzak's title to the paper mill against all adverse *title* claims, as follows: "[STG] insures . . . against loss or damage . . . sustained or incurred by the Insured by reason of . . . (2) [a]ny defect in or lien or encumbrance on the Title." Insurance against the results of a title defect is not the same as insurance against a loan loss or the value of collateral.  The coverage clause in the policy states in pertinent part as follows:

> This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by [Amzak] who has suffered loss or damage by reason of matters insured against by this policy.

The policy expressly recognized that a title defect might exist yet cause no compensable loss:

> The following matters are expressly excluded from coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of: . . . (3) Defects. . . . (c) resulting in no loss or damage to the Insured Claimant.

Clearly, STL contracted to indemnify Amzak for loss, but only in the event that loss resulted from failure of title.[3]  Moreover, the policy language expressly limits Amzak to recovering when there has been *some actual* loss or damage to Amzak.  It follows that Amzak must show that it suffered actual

---

[3] *See First Nat'l Bank of Jeanerette v. Lawyers Title Ins. Corp.*, No. 08-0913, 2010 WL 3734056, at *4 (W.D. La. Aug. 12, 2010), *adopted and entered by the district court*, 2010 WL 3734020 (W.D. La. Sept. 16, 2010).

loss because of a failure of title, and if it cannot do so, then STL cannot be held responsible for any harm suffered by Amzak.

The previously described events do not add up to loss from the title defect. Amzak purchased title insurance from STL in connection with its mortgage on the paper mill, but STL filed Amzak's mortgage without attaching the property description.[4] The paper mill continued to experience severe financial difficulties. According to Amzak, Caoba notified Amzak that it would not go through with a verbally agreed upon investment deal because of "deficiencies in [the] mortgage." Amzak made a claim to STG, STL's underwriter, based on the policy, and STL retroactively cured the title defect. WFA filed for bankruptcy and the paper mill shut down. Amzak purchased the mill at the court-ordered sale of WFA's assets. Amzak's title to the paper mill never failed; on the contrary, its title was preserved through STL's correction efforts, Amzak's negotiation with WFA, and the dismissal of the Creditors' Committee suit. We thus agree with, although we are not bound by, this court's opinion in *First State Bank v. American Title* and hold that because "[Amzak's] title did not fail, it is impossible for any loss to be attributed to a failure of title and thus be covered by the policy." 91 F.3d 141, 1996 WL 400322, at *3 (5th Cir. 1996) (per curiam) (not designated for publication). Amzak's loss is attributable to some other fortuities concerning WFA, none of which were insured against by STL. *Id.* STL insured Amzak's

---

[4] For a mortgage on immovable property (real estate) to be valid, it must comply with Article 3288 of the Louisiana Civil Code, which provides that a mortgage "must state precisely the nature and situation of each of the immovables or other property over which it is granted." Without a detailed description, a mortgage has no validity, not even between the mortgagor and the mortgagee. *See, e.g.,* 1 La. Prac. Real Est. § 13:29 (2d ed. Nov. 2012) ("a vague property description renders the mortgage invalid even as between the parties"). STL has acknowledged that its recordation of the mortgage without a legal description was a "title defect."

title to the property, not the property's fair market value. *Id.* Accordingly, we agree with the district court's conclusion that STL did not breach the policy.

As an alternative basis for finding that STL breached the title policy, Amzak points to *Citicorp Savings of Illinois v. Stewart Title Guaranty Co.*, 840 F.2d 526 (7th Cir. 1988), for the proposition that breach occurred at the time of the loan because that is when the title of the mortgage became voidable. In *Citicorp*, the Seventh Circuit held that the policy was breached at the time of the loan because (i) the "lien was unenforceable *ab initio*," (ii) the title policy was "intended to ensure that Citicorp could enforce the lien" when the loan was closed, and (iii) that is "what the parties intended when they entered into the agreement [the policy]." *Id.* at 529. The court explained that the lender "would not have extended [the loan] on the basis of a voidable mortgage" and that STG "breached the policy's guarantee of the mortgage's enforceability." *Id.* at 530. Amzak argues that its situation is the same: the title insurer insured its title, the title was defective at the time the loan closed, and the policy was breached because the mortgage "was unenforceable" at the time of the loan.

A second issue in *Citicorp* was whether STG's tender of the property to the lender "cured" the breach of the policy. *Id.* at 530. The Seventh Circuit explained that "nowhere in the policy does it state that the insurer may tender the [property] in lieu of damages" and "tender is an imperfect substitute for damages," because the property "may have been worth much less due to changes in market value." *Id.* Amzak claims that the same analysis applies in the instant case. At the time the loan closed in August 2009, the mill was operating and was appraised for $77 to $81 million; after the bankruptcy was filed, the mill shut down and its value plummeted.

However, *Citicorp* is not binding on this circuit, and it hardly expresses a "universal" view—recall that this court reached an opposite conclusion in *First State Bank*. The case is not only distinguishable but has been rejected in

Illinois, which supplied the rule of decision. First, *Citicorp* rested on a finding that the title policy at issue did more than indemnify against actual loss; according to the court, it actually guaranteed to the lender that its mortgage was valid. *Id.* at 529-30. The policy that STL issued to Amzak, however, contains no guarantee of Amzak's title. It simply provides for indemnity if actual loss results from a title defect. Under Amzak's policy, the mere existence of a defect is not a breach, but simply an occasion to consider whether the insured has suffered a compensable loss. As previously established, because Amzak dealt with the collateral securing its mortgage in such a way that the issue of title defect never had to be resolved, it did not suffer loss *because of* any title defect.[5]

Finally, other courts have also rejected the guarantee rationale in *Citicorp* and have instead enforced the principle underlying *First State Bank*: indemnity is only for actual loss caused by a title defect. *See, e.g., Focus Inv. Assocs. v. Am. Title Ins. Co.*, 992 F.2d 1231, 1237 (1st Cir. 1993); *Gibraltar Sav. v. Commonwealth Land Title Ins. Co.*, 905 F.2d 1203, 1205 (8th Cir. 1990); *JP Morgan Chase Bank, N.A. v. First Am. Title Ins. Co.*, 725 F. Supp. 2d 619, 623 (E.D. Mich. 2010). We now formalize the holding in *First State Bank* and likewise reject the guarantee rationale of *Citicorp*, and we agree with the

---

[5] It is arguable that *Citicorp* no longer reflects Illinois law. In 2006, the Illinois Supreme Court eviscerated *Citicorp*'s warranty rationale, holding that title insurers are not in the business of providing information. *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E. 2d 327, 335-36 (Ill. 2006). The court stated: "We conclude, therefore, that a title insurer is not in the business of supplying information when it issues a title commitment or a policy of title insurance. . . . The scope of a title insurer's liability is properly defined by contract." *Id.* A 2012 decision from the Northern District of Illinois confirms that *Citicorp*'s premise did not survive the *First Midwest* decision. *First Tenn. Bank, N.A. v. Lawyers Title Ins. Corp.*, 282 F.R.D. 423, 426-27 (N.D. Ill. 2012). The district court emphasized that the mere existence of a title defect does not oblige the title insurer to pay damages; the defect must cause the lender an actual loss. *Id.*

No. 13-30675

district court's rejection of Amzak's argument that STL breached the title policy at the time of the loan because its mortgage was voidable at that time.

*C. Amzak's Negligence Claim*

Amzak also appeals the district court's grant of summary judgment in favor of Appellees on its negligence claim. Under Louisiana law, to succeed on a negligence claim, a plaintiff must prove:

> (1) the had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard of care (breach of duty element); (3) the defendant's sub-standard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was the legal cause of the plaintiff's injuries (the scope of protection element); and (5) actual damages (the damages element).

La. Civil Code art. 2315.

The cause-in-fact element is dispositive here. When there are multiple causes of loss, the proper inquiry is whether the complained-of conduct was a substantial factor in bringing about the loss. *Perkins v. Entergy Corp.*, 782 So. 2d 606, 611 (La. 2001); *see also Westchester Fire Ins. Co. v. Haspel-Kansas Inv. P'ship*, 342 F.3d 416, 420 (5th Cir. 2003). In determining whether an event was a "substantial factor," the questions are "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm" and whether each of the multiple causes "played so important a part in producing the result that responsibility should be imposed upon" each item of conduct. *LeJeune v. Allstate Ins. Co.*, 365 So. 2d 471, 477 (La. 1978).[6]

---

[6] *Amzak* points to *First Nat'l Bank of Louisville v. Lustig*, 961 F.2d 1162 (5th Cir. 1992) to support a wider reading of "by reason of." *Lustig* interpreted coverage issues arising from a banker's blanket bond. In that case, the lender would not have made the loans "in the absence of the [employee's] fraud." Likewise, *Amzak* argues, it would not have made its loan "in the absence of a valid mortgage." Hence, under a lender's title policy, as in Lustig, "[t]here will always be" other causes "for the failure of [the loan] to be repaid," because "otherwise the

12

No. 13-30675

In order to prove that the title defect was a substantial factor in bringing about Amzak's purported loss, Amzak had to create a genuine issue of material fact as to the following chain of events: (1) Amzak and WFA had agreed on the terms of a forbearance agreement, which included an additional capital infusion by WFA; (2) the investors would have made a $7-8 million infusion investment despite the existence of the Fluor and subcontractors liens, which they believed to be a threat; (3) with that infusion, WFA would not have filed bankruptcy; (4) that infusion would have been enough to turn around the mill financially; and (5) the mill would have become profitable, allowing WFA to repay its creditors, including Amzak, in full.

As the district court aptly noted, Amzak has not done this. *Tembec Indus., Inc. v. Amzak Capital Mgmt., LLC*, No. 11-622-JJB (M.D. La. May 1, 2013). Amzak's expert, Professor Glynn Lunney, Jr., did not project what WFA might do with a capital infusion, could not testify to what creditors would have been paid with such an infusion or what portion would remain for Amzak, and stated "[i]t would be foolish . . . to make a post hoc prediction of what would have actually happened (or not happened) if the Mortgage defect had not existed . . . because there are too many variables that would have changed the result." Amzak has invested at least $58 million in its subsidiary which now runs the mill, and the mill continues to lose money. Finally, the defect was effectively waived by the parties in bankruptcy, as Amzak was permitted to bid its debt to obtain the property as if there had been no title defect. We agree with the district court that Amzak did not create a genuine issue of material fact as to these essential steps of causation.

---

[lender] would suffer no loss." *Id*. at 1167. All this may be true, but as discussed above, Amzak has not proven that its loss resulted from a defect in the mortgage.

We briefly mention legal causation, although the lack of cause-in-fact is enough to dispose of Amzak's negligence claim.  Under Louisiana law, legal causation is "ultimately a question of policy as to whether a particular risk falls within the scope of the duty."  *Roberts v. Benoit*, 605 So. 2d 1032, 1044 (La. 1991).  STL's duty to Amzak is defined by the title policy.  As we have stated, the policy provides indemnity for actual loss "by reason of" title defect; it does not guarantee the effectiveness of Amzak's mortgage or the property's fair market value.  Accordingly, under the undisputed facts developed here, STL's delay in making a complete filing of Amzak's mortgage was not a legal cause of Amzak's loss.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

14