**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2023-CA-00504-COA**

**HUNTER WILLIAM FOOTE, JR.**                                    **APPELLANT**

**v.**

**MEMORIAL HOSPITAL AT GULFPORT**                               **APPELLEE**

DATE OF JUDGMENT:              04/19/2023
TRIAL JUDGE:                  HON. LAWRENCE PAUL BOURGEOIS JR.
COURT FROM WHICH APPEALED:    HARRISON COUNTY CIRCUIT COURT,
                              FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:       JOE SAM OWEN
ATTORNEYS FOR APPELLEE:       FREDRICK B. FEENEY II
                              SHELLYE VINES McDONALD
NATURE OF THE CASE:           CIVIL - MEDICAL MALPRACTICE
DISPOSITION:                  AFFIRMED - 03/25/2025
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Hunter William Foote Jr. appeals from the Harrison County Circuit Court's judgment dismissing his claims against Memorial Hospital at Gulfport (Hospital) for injuries he sustained due to the alleged medical negligence of the hospital's employee Dr. Joseph Graham. Foote sued his orthopedic surgeon, Dr. Dudley Burwell, and the surgeon's clinic, Advanced Orthopedic Associates P.A. (AOA), after Burwell pierced Foote's iliac vein during hip replacement surgery. Foote also sued the Hospital, a public entity, under the Mississippi Tort Claims Act (MTCA) for the negligence of vascular surgeon Graham, who was consulted but allegedly failed to timely repair the damaged vein.

¶2.     The private defendants were entitled to a jury trial, but under the MTCA, the claims

against the Hospital were to be tried and decided by the judge. The circuit court decided not to sever the claims but partially bifurcated the trial to allow the jury to consider the claims against all parties, assess damages, and allocate fault, with the verdict being binding on Burwell and AOA but only advisory as to Foote's claims against the Hospital, which the court would decide. The jury found both the private and the public defendants liable and allocated fault between them at 75% and 25%, respectively. The circuit court entered a judgment against Burwell and AOA. Time passed, and the court eventually issued findings of fact and conclusions of law dismissing Foote's claim against the Hospital, holding that Foote had failed to prove that any negligence by Graham caused Foote injury. Foote appeals raising numerous issues, including that he had proved medical causation. Having considered the record, the arguments of the parties, and relevant precedent, we affirm the circuit court's judgment.

**Facts**

¶3.     On June 5, 2015, when Foote underwent his hip replacement surgery at the Hospital, he was a fifty-five-year-old security guard who suffered from degenerative arthritis for which he was treated by Dr. Dudley Burwell, an orthopedic surgeon at AOA, Burwell's clinic. Burwell performed the hip replacement surgery at the Hospital, which was a community hospital and a political subdivision of the State, subject to the provisions of the MTCA.

¶4.     Burwell began Foote's surgery at 8:09 a.m. Burwell admitted that during the surgery he drilled a hole into Foote's pelvic bone to insert an acetabular screw. He drilled too far and used a screw that was too long. In the process, he penetrated Foote's left iliac vein. Burwell

2

removed the larger screw and plugged the hole with a smaller screw. Then, at 8:58 a.m., he drilled a hole for a shorter replacement screw, but he observed venous (i.e., darker- colored) blood coming from the original hole. Foote's blood pressure dropped at 9:03 a.m., and nurse anesthetist Meghan Fisackerly told Burwell she was having a problem with Foote's blood pressure. At some point, Burwell requested a vascular surgeon consult because of the significant bleeding.

¶5.     Vascular surgeon Graham, who was employed by the Hospital and assisting in another procedure, was notified of the request around 9:51 a.m. He advised that he was unavailable and that if it were an emergency, the paging service should notify someone else. Burwell then contacted Graham directly around 10:00 a.m. Graham agreed to come to Burwell's operating room as soon as he was able. When Graham arrived, he reviewed Foote's vitals, which were normal at the time, and spoke to the anesthesia team. Foote was still lying on his side, and normally, Graham would examine a patient for a bleed in a supine (i.e., on his back) position. Graham suspected a potential retroperitoneal hematoma but determined that Foot was stable and could be managed non-surgically until they could definitively diagnose him by means of a CT scan. Graham said he did not do an ultrasound, explaining it would have revealed little because an ultrasound does not penetrate all the organs and bowels to see into the back of the retroperitoneal area.

¶6.     Foote was given blood and medication to stabilize his blood pressure. Believing Foote was stable enough to proceed, Burwell continued the hip replacement surgery. Burwell finished at 10:19 a.m., and at 10:32 a.m., Foote was received into the post-anesthesia

care unit (PACU) where patients are taken for monitoring until anesthesia wears off. Nurse anesthetist Megan Fisackerly and anesthesiologist Dr. Henry Hawney accompanied Foote. On Foote's arrival in the PACU, he had severe hypotension (a blood pressure of 45/28) and went into renal failure. Hawney felt Foote's condition was critical and that Foote was not stable enough for a CT. So Graham was called again. Graham came to the PACU, and diagnosed Foote with a large retroperitoneal hematoma, which required evacuation. Hawney and Burwell agreed that immediate surgery was needed.

¶7.     In the operating room, at 11:30 a.m. Graham performed a "left common femoral artery and superficial femoral artery thrombectomy." The surgery required reconstruction of the iliac vein with a bypass graft.

¶8.     Burwell admitted that placing the screw into Foote's vein was not within the medical standard of care. Burwell agreed that uncontrolled vascular bleeding could lead to a loss of blood pressure and death if not controlled. He further agreed that Foote's internal bleeding was the cause of his low blood pressure. During his hip surgery, Foote was given blood and "pressors" (i.e., medication to raise his blood pressure).

*Complaint and Amended Complaint*

¶9.     On August 25, 2016, Foote filed a medical negligence suit against Burwell and AOA, and in a second amended complaint, and on October 9, 2017, he added the Hospital as a defendant. Foote alleged that Graham should have performed the vascular repair while Foote was still undergoing the hip replacement surgery instead of allowing Burwell to close and send Foote to recovery.

4

*Motion to Bifurcate Trial*

¶10.	Prior to trial, on June 21, 2019, the Hospital filed a "Motion for Total Bifurcation" of the case. The Hospital presented the court with the options it felt were available when a party asserts claims against both a sovereign entity and a private entity and when the MTCA (Mississippi Code Annotated section 11-46-13(1) (Rev. 2019)) required the court to decide claims against the Hospital. The Hospital pointed out that the court could either (1) sever the action into two trials or (2) allow the action to proceed in a single, yet bifurcated trial where the judge decided issues of fact and the liability of the Hospital, and the jury decided issues of fact and the liability of the private defendants. Citing M. Madison Taylor, *Resolving the Conflict Between the Bench Trial Provision of the Mississippi Torts Claims Act and the Right of Trial by Jury under the Mississippi Constitution*, 81 Miss. L.J. supra 21 (2011), the Hospital proposed that at the close of the evidence, the judge should consider the claims against the Hospital and that the jury consider only the claims against the private parties. The court would render its decision regarding the Hospital's liability prior to the announcement of the jury's verdict against the private parties.[1]

¶11.	Foote responded to the motion on July 3, 2019, disagreeing with what he understood to be the Hospital's proposal concerning the trial: i.e., that the court adjudicate Foote's claims against the Hospital before the jury deliberated the claims against Burwell and AOA. Foote

---

[1]	The Hospital also filed a Motion for Partial Summary Judgment on the issue of damages to preclude any bills incurred during inpatient admission, which the Hospital had written off. Foote disputed the write-off amount and agreed it should not be mentioned during trial. The court granted the Hospital's motion on August 9, 2019, limiting recovery for past medical expenses but not preventing Foote from using the full amount of medical bills to show the seriousness of his injuries.

gave a hypothetical to illustrate the alleged potentially unfair outcome. Foote posited that should the court determine that the Hospital bears no fault, but the jury assessed damages at $1,000,000 and allocated 40% to the Hospital, then Foote could recover only $600,000 from Burwell and AOA. Foote claimed this would result in a miscarriage of justice—namely, allowing the jury to allocate fault to a co-defendant who has been adjudicated to be fault-free. Foote proposed that "the only fair and error free approach" would be to allow the jury to allocate fault to the defendants without any preliminary ruling by the court. The court could then consider the jury's finding of fault as to the Hospital as advisory only.

¶12. On July 25, 2019, the circuit court heard arguments on the motion for bifurcation, during which Foote reiterated his position that the case against both defendants be tried together, that the jury allocate fault, and that the court consider the jury's allocation to the Hospital as advisory. The circuit favored Foote's approach and entered an order that partially bifurcated the trial, stating that the jury's verdict on the claims against the Hospital would be advisory only. Thus, the court would determine the liability of the Hospital as required by the MTCA.

*Trial*

¶13. The judge held a jury trial from August 26 to September 6, 2019. The Hospital fully participated in all aspects of the trial—voir dire, presentation of evidence, submission of jury instructions, and arguments to the jury. The jury was not advised that its verdict as to the Hospital was advisory only. At trial, Foote made no objection to the Hospital's participation

6

in all facets of the proceedings.[2]

¶14.	To prove his case against the Hospital, Foote called Burwell and Graham to testify, as well as his expert, Dr. Shane Brooks, a surgeon.

¶15.	Graham testified that he was first called at 9:51 a.m. and then again by Burwell personally at 10:00 a.m. He went to Burwell's operating room and stayed about five minutes, assessing the patient and learning what had been done for Foote thus far. He confirmed the medications Foote had been given and observed that the bleeding was no longer evident in the open wound. Graham testified that they developed a plan to address the bleeding with medications. Later, however, Foote required extensive surgery to repair the iliac vein injury.

¶16.	Banks, Foote's surgeon expert, testified about his background and qualifications. He was a Missouri native who attended the Air Force Academy in Colorado Springs. He then went to medical school and served as an Air Force physician specializing in surgery from 2001 to 2013. During that time, he spent six months in Iraq in 2008 and later served in Afghanistan for six months in 2011. There, he served on a front-line surgical team "like the TV show M.A.S.H." As a combat surgeon, he said he treated numerous vascular injuries and personally handled hundreds of amputations. As an example, he described a soldier who had stepped on a bomb and lost both legs. The man's pelvis was shattered, and all the blood

---

[2] Foote did not designate the transcript of the entire trial for purposes of his appeal. Rather, he apparently designated only portions he determined were relevant to his case against the Hospital. Thus, the transcript does not include testimony from Dr. Sonny Bal, Foote's liability expert against Burwell, or Foote's accountant expert, Holly Sharp, concerning Foote's economic losses. Nor does the trial transcript contain testimony from several doctors called by Burwell, including his expert, Dr. Southworth, and three experts to testify about Foote's economic losses, especially related to his ability to work (Bruce Brawner, Dan Cliffe, Dr. Kaufman).

vessels were ripped open. It was Banks's responsibility to save patients like these. He stated that he dealt with hundreds of patients with some vascular injury.

¶17. In his private practice in Nebraska, Banks testified that he often treated vascular injuries because he was the only full-time surgeon in four counties. Foote tendered Banks as an expert in the field of general surgery, adding "which includes vascular injuries." The Hospital objected to the inclusion of vascular experience in Banks's area of expertise, arguing that Banks was either a general surgeon or a vascular surgeon. The court accepted Banks as an expert in general surgery but imposed no limitation on Banks's ability to testify about vascular matters.

¶18. Banks noted that during Foote's hip surgery, Burwell bore a hole through Foote's pelvic bone and pierced Foote's iliac vein, which began to bleed. From the medical records, Banks identified several medications that Foote was administered that were used to constrict blood vessels. Banks testified to a reasonable degree of medical probability that the administration of these drugs was to treat Foote's hypotension from the iliac vein bleed. In addition, Foote's vital signs and elevated heart rate, which were also consistent with bleeding, confirmed that Foote suffered an intrapelvic bleed. Banks pointed out that Foote's blood pressure narrowed (to 100 over 90 when, in a normal reading, one number should be twenty-five points or more higher than the other, like 120 over 80). To a physician, this pressure reading indicated that there was a low volume of blood circulating in the patient and that the patient was bleeding. Banks also described the severity of the bleeding, stating that it was a surgical emergency, and said Foote never should have left Burwell's operating room.

8

Banks testified that when Foote arrived at the PACU, Foote's blood pressure registered at 48 over 24, which was near death. It only rose to 110 over 78 four minutes later because Foote was given a massive dose (4,000 times the normal) of Vasopressin. But eight minutes later, Foote's blood pressure fell again.

¶19. Although there was a dispute as to when Graham received the call from Burwell and actually arrived at Burwell's operating room, Banks gave the opinion to a reasonable degree of medical probability that Graham had deviated from the standard of care. He stated the vital sign history (red flag #1) and discussions with the anesthesiologist concerning the amount and type of drugs Foote was given (red flag #2) should have led Graham to perform a simple ultrasound test, which would have revealed bleeding in Foote's belly. Banks pointed out the amount of blood Foote had lost—between 25% and 30%. He also stated that an iliac vein injury, by itself, had a 25% death rate when blood loss is a problem. In Banks's opinion, Graham should have repaired the damaged vein while Foote was still in Burwell's operating room. The incision for the hip surgery could have been packed, and Foote could have been placed in a supine position for the vascular repair.

¶20. Banks testified that although Graham eventually repaired the vein injury with a bypass graft, over time, Foote suffered several complications due to the extreme blood loss he had experienced. He had a clot in his femoral artery and developed deep vein thrombosis. He had to be placed on a ventilator and developed kidney failure due to a total loss of 4.5 liters or more of blood. Other complications included sepsis (a bacterial infection).

¶21. The Hospital's attorney cross-examined Banks, highlighting that Banks was a general

9

surgeon, not a vascular surgeon. However, Banks had vascular privileges related to the treatment of traumas at his hospital. Banks pointed out that he had treated thousands of traumatic injuries, and hundreds of those involved pelvic vascular injuries. He had performed shunts and bypasses and had the experience, if not the paper credentials, of a surgeon treating vascular injuries.

¶22. After Foote rested, the Hospital moved for an involuntary dismissal under Mississippi Rule of Civil Procedure 41(b). The Hospital presented a copy of Banks's trial testimony and argued that Foote's case against it was a "loss of chance" case where the negligence alleged was that a defendant allowed some situation to go untreated. The Hospital argued that to prove a causal connection in such cases, the plaintiff has to prove something beyond a mere loss of a chance of a better result, citing *Memorial Hospital v. White*, 170 So. 3d 506 (Miss. 2015). The court denied the Hospital's Rule 41(b) motion.

¶23. In its defense, the Hospital recalled and questioned Graham and its own retained expert, Dr. Edward Rigdon, whom the court accepted as an expert in vascular surgery. Rigdon testified that Graham's actions in delaying surgery were reasonable, especially because of the "self tamponade effect." This effect, he explained, occurs when an injured blood vessel experiences outside pressure that stops or slows bleeding. This pressure can come from the development of a hematoma (clot) in the retroperitoneal space. A doctor does not want to move a patient so as not to disturb the tamponade effect. Thus, it was reasonable for Graham to evaluate Foote and manage his condition while giving him time to prepare for an invasive surgical procedure, if necessary. He distinguished Foote's case from battlefield

10

injuries that Banks may have treated, where tissue was missing, and there was no opportunity for tamponade. Rigdon further opined that by the time Graham got to Burwell's operating room, Foote had bled so much that immediate surgery would not have made any difference in the outcome. Foote would have suffered the same complications.

¶24. At the close of evidence, the Hospital renewed its Rule 41(b) motion for involuntary dismissal, arguing, among other things, that Foote had failed to present proof of causation. The Hospital's attorney stated that there might be questions of fact in dispute concerning Graham's duty or breach but that Foote had presented nothing to establish or create a dispute about causation. The court ruled:

> All right. As I said, the standard is that the plaintiff must make out a prima facie case and all the evidence is accepted as true. And that is still the position that you are in right now. If no hypothetical juror could reach a verdict then it should be granted, but otherwise[,] it shouldn't be.
>
> But we got Dr. Banks. He said there was a deviation from the standard of care. The volume of the medication, the fact that a ultrasound was not done. He also said Mr. Foote should have never left the operating room. In other words, the assessment was not thorough enough, that was the breach. And I think he said should have never left the operating room because if you lose the volume of blood he lost that causes death. That was as to Dr. Graham.

The court then mentioned Foote's expert, Dr. Bal, who testified to Burwell's violations of the standard of care. The court concluded:

> So as far as the Court is concerned, that raises a question and it should go to the jury. So I'm denying or overruling, I should say, the motions for directed verdict and the motions to dismiss by both defendants.

¶25. Foote called nurse anesthetist Fisackerly in rebuttal, questioning her again as to Foote's condition during the hip surgery, her conversations with Burwell, and the actual time

11

Graham was called.

¶26.   The parties argued the jury instructions to the court, after which the jury was instructed, and the attorneys made closing arguments.  In his rebuttal argument, Foote's attorney argued that Burwell had been less than truthful about not knowing the seriousness of Foote's condition even though nurse anesthetist Fisackerly told him about her difficulty in controlling Foote's blood pressure.  Foote's attorney then said:

> Dr. Burwell knew this man was bleeding.  He knew he was having struggles with the blood pressure, and he knew there was a correlation between the blood pressure - - he knew there was a correlation between the blood pressure and the bleeding.  It is not just a coincidental phone call at 10:00 o'clock, ordering blood ASAP as 9:56, and then claim, "I don't know what's going on."
> Back to Dr. Graham.  Looking at the records, listening and verifying what's on these records, listening to his testimony - - you know, I tried to do what was right as a lawyer, probably 47 years, and I may have been wrong, but I was never in doubt about thinking what I thought was right, and what I think is right is I'm not sure under these circumstances Dr. Graham did anything wrong.  That's my honest gut feeling.  It's your decision.
> But what I think happened, I think Dr. Burwell used the anesthesia team and Dr. Graham as a shield.  I really do, I don't think it's fair under the circumstances.  It's not fair to that man [Foote].  He has been through the ringers.

Foote's attorney later added, speaking of Burwell's liability:

> It was a deviation from the standard of care, just like Dr. Bal said.  The risk was ignored until the surgery was over, and then the blame was put off on Dr. Graham.  Blame the nurses, blame Dr. Graham, blame anesthesia, CRNA.

¶27.   After deliberations and by unanimous vote, the jury returned a verdict for Foote against the defendants and assessed 25% fault to the Hospital and 75% to Burwell and AOA.  The jury computed Foote's total damages at $2,107,351.20, which included $994,000 for past and future pain and suffering, which the court reduced to $500,000 pursuant to

12

Mississippi Code Annotated section 11-1-60(2)(a) (Rev. 2019).[3] Consistent with the jury finding, the circuit court entered a judgment against Burwell and the Clinic for 75% of the total, which amounted to $1,210.013.40, on September 18, 2019. The court took the MTCA claim under advisement.

¶28. A year passed, and on December 17, 2020, Foote filed a motion for a ruling on the MTCA claim. On March 21, 2023, the circuit court entered its findings of fact and conclusions of law and dismissed Foote's case against the Hospital. The court recited Foote's allegations against the Hospital as stated in his second amended complaint. The court held that the testimony of Foote's general surgery expert, Banks, did not establish medical causation to support the claim against the Hospital. The court also noted that during his closing argument, Foote's attorney stated that he did not think Dr. Graham did anything wrong. Despite Foote's lack of expert evidence on causation and Foote's attorney's comments that Graham did nothing wrong, the court stated that the jury still allocated Graham a portion of the fault. The court explained, "[T]his illustrates the sometimes inexplicable ways of a jury, especially when the jury's passion, sympathy and prejudice, as in the instance case are stirred by the expert strategy of Plaintiff's counsel." The court noted the need for expert testimony and stated that Foote's case was not a battle of the experts but,

---

[3] Section 11-1-60(2)(a) provides:

In any cause of action filed on or after September 1, 2004, for injury based on malpractice or breach of standard of care against a provider of health care, including institutions for the aged or infirm, in the event the trier of fact finds the defendant liable, they shall not award the plaintiff more than Five Hundred Thousand Dollars ($500,000.00) for noneconomic damages.

rather, a case where Foote failed to offer proof of an essential element of his claim, causation. Because of this failure, the court found that discussion of the other elements such as the standard of care and damages was unnecessary. On April 19, 2023, the circuit court entered a final judgment of dismissal of Foote's claims against the Hospital.

¶29. On April 6, 2023, Foote appealed. He argues that the circuit court erred in (1) including in its findings as evidence Foote's counsel's comments in closing argument that Graham did not do anything wrong, (2) finding that Foote's medical expert, Banks, did not have the experience to testify to the standard of care of a hospital-employed vascular surgeon and that Banks's testimony did not established that Graham had proximately caused or contributed to Foote's injuries (medical causation), (3) allowing the Hospital to fully participate in the jury trial from voir dire to closing argument, and (4) allowing the jury to allocate fault and then finding that the jury's allocation was not supported by substantial evidence.

## Standard of Review

¶30. "When reviewing the factual findings of the circuit court sitting as the sole trier of fact in a bench trial, we apply the substantial-evidence standard of review." *Delta Reg'l Med. Ctr. v. Taylor*, 112 So. 3d 11, 23 (¶35) (Miss. Ct. App. 2012) (citing *Covington County v. G.W.*, 767 So. 2d 187, 189 (¶4) (Miss. 2000)). We will not reverse the trial court's decision unless that decision is "manifestly wrong or clearly erroneous, or the trial court applied an erroneous legal standard." *Pittman v. Mem'l Hosp. at Gulfport*, 300 So. 3d 1053, 1058 (¶18) (Miss. Ct. App. 2020). "A finding is 'clearly erroneous' when, although there is evidence to support

it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Phillips v. City of Oxford*, 368 So. 3d 317, 323 (¶20) (Miss. 2023).

## Discussion

### I. Whether the circuit court erroneously relied upon counsel's closing argument comments as evidence.

¶31. In its findings of fact and conclusions of law, the circuit court found that Foote's expert, Banks, "did not offer any testimony on the issues of proximate cause regarding Plaintiff's claims against Memorial." The court also quoted the portion of the closing argument in which Foote's attorney said that he was not sure that Graham did anything wrong. On appeal, Foote argues that because the court erroneously considered his attorney's comments as "evidence," the judgment should be reversed. The Hospital contends that the court's reference to the attorney's comments in closing was merely an introduction to the court's discussion of how the jury still found the Hospital partially liable despite these comments.

¶32. The parties agree, and Mississippi law is very clear, that a jury may not consider the arguments of counsel as evidence. For example, in *Berry v. Patten*, 51 So. 3d 934, 941 (¶31) (Miss. 2010), a medical negligence case, Dr. Berry appealed a verdict for the plaintiff and argued, among other things, that the plaintiff used the wrong medical term in its jury instruction on the standard of care that Berry was supposedly subject to—a term different from the one used by the medical witness. The plaintiff argued that even though the wrong term was used and the jury may have been confused, its attorney had pointed out the error

15

in closing arguments. *Id.* However, the Mississippi Supreme Court stated that "counsel's closing argument is not evidence[.]" *Id.* Therefore, it held that there was insufficient evidence to support the jury instruction. *Id.*

¶33. This Court cited *Berry* in *McNabb v. L.T. Land & Gravel LLC*, 77 So. 3d 1140 (Miss. Ct. App. 2011). In that case, L.T. Land sued McNabb for misrepresentation, alleging it purchased a truck relying on McNabb's claim that he had rebuilt the lower half of a truck's engine. *Id.* at 1141 (¶1). In a bench trial, the circuit court found that L.T. Land had not proved that McNabb's engine-rebuild claims were false but nonetheless awarded L.T. Land damages on a special breach of warranty theory (an implied warranty of fitness for a particular purpose), which, on appeal, McNabb contended was never pled or tried by consent. *Id.* McNabb pointed out that the only time this breach of warranty claim was mentioned during the trial as a basis for recovery was during L.T. Land's closing argument. *Id.* at 1144 (¶16). We stated that "counsel's closing argument is not evidence," citing *Berry*, 51 So. 3d at 941 (¶31), and further held that comments made during a closing argument could not form the basis for Rule 15(b) implied consent. *McNabb*, 77 So. 3d at 1144 (¶16). We held that L.T. Land's implied warranty claims were not properly before the circuit court because L.T. Land neither pled nor obtained McNabb's implied consent to try these issues. *Id.* at 1147 (¶28).

¶34. Just as in *McNabb*, where counsel's comments during closing could not be used as a basis to bind a party to consenting to the trial of an issue, here Foote's counsel's personal opinions about Graham should not be construed as an admission by Foote that Graham was

16

not liable. Yet the circuit court seems to have done so, noting in footnote 4 of its opinion that the jury found in favor of Foote against the Hospital *despite* counsel's comments that Graham did not do anything wrong and the lack of expert testimony on causation (two factors the court apparently found significant). The court reasoned this "illustrates the sometimes inexplicable ways of the jury." Moreover, the court later stated in its conclusions of law that to find for Foote, the court would have to "ignore the arguments of Plaintiff's counsel *and* [*the Hospital*]'s counsel—that Dr. Graham did not do anything wrong" and find on its own that Graham did. If the circuit court's inclusion of these comments means that it considered them as an admission by a party, which is evidence, then the court erred.

¶35.  However, we will not reverse a judgment because of the erroneous admission of evidence "unless the error actually prejudiced a party or adversely affected a party's substantial rights." *Haynes v. Beckward*, 358 So. 3d 1080, 1088 (¶24) (Miss. Ct. App. 2023). "Under the harmless error doctrine, 'if the weight of the evidence is sufficient to outweigh any harm done by the error[,] then reversal is not warranted.'" *Id*. at 1085 (¶¶13-14) (quoting *Murray v. Gray*, 321 So. 3d 1166, 1182 (¶47) (Miss. Ct. App. 2020)). In *Haynes*, the defendant argued on appeal that the trial court had erroneously excluded testimony that would have shown that a truck and trailer he backed out of a construction road presented no dangerous condition because drivers could drive around him. *Id*. at 1087 (¶19). This Court reviewed the other testimony and found that the jury could have inferred that the other vehicles passed the truck and trailer before the collision and found no reversible error. *Id*. at 1088-89 (¶24). Thus, we found any error in excluding the testimony to be harmless. *Id*.

17

¶36. In the case at hand, the circuit court correctly stated that medical negligence may be established only by expert medical testimony, except when a layman can observe and understand the negligence as a matter of common sense. *Henson v. Grenada Lake Med. Ctr.*, 203 So. 3d 41, 44 (¶8) (Miss. Ct. App. 2016). Although the circuit court mentioned Foote's attorney's comments, the circuit court first determined that Banks's medical expert testimony was insufficient to prove Graham's actions were a proximate cause of Foote's injuries, which was a necessary element of Foote's medical negligence claim against the Hospital. The circuit court found:

> At trial, Plaintiff offered the testimony of Dr. Banks, as his sole expert witness, in support of his negligence claim against [the Hospital]. (Testimony of Dr. Banks). Based upon a careful review of Dr. Banks' testimony, this Court finds that Dr. Banks did not offer any testimony on the issue of proximate cause regarding Plaintiff's claims against [the Hospital]. (Transcript of Testimony of Dr. Banks).

Because such a finding would be sufficient to support the circuit court's judgment in favor of the Hospital, any reliance by the circuit court on Foote's attorney's comments, albeit error, was harmless error.

**II.    Whether the circuit court erred in finding that Foote had failed to present a prima facie case that Graham proximately caused or contributed to Foote's injuries (medical causation) through qualified expert testimony.**

¶37. The circuit court's primary reason for dismissing Foote's claim against the Hospital was its determination that Foote's expert, Banks, "did not offer any testimony on the issues of proximate cause regarding Plaintiff's claims against [the Hospital]." On appeal, Foote argues that Banks, who was qualified to testify to the standard of care of a vascular surgeon,

18

had testified to causation.

### A. Banks's Qualifications

¶38.    Mississippi Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if his opinion will help the trier of fact, is based on sufficient facts, and is the product of reliable principles that the expert has reliably applied to the facts.  MRE 702. "[A] witness need not be a specialist in any particular profession to testify as an expert. The scope of the witness's knowledge and experience, and not any artificial classification, governs the question of admissibility."  *Kilhullen v. Kansas City S. Ry.*, 8 So. 3d 168, 172 (¶10) (Miss. 2009); *see also Sacks v. Necaise*, 991 So. 2d 615, 622 (¶¶23-24) (Miss. Ct. App. 2007).   In medical negligence cases, "[t]here is no requirement that an expert in a medical-malpractice case be a specialist in the same area as the doctor about whom the expert is testifying in regard to the standard of care."  *Fipps v. Greenwood Leflore Hosp.*, 237 So. 3d 194, 196-97 (¶9) (Miss. Ct. App. 2018) (quoting *McDaniel v. Pidikiti*, 39 So. 3d 952, 956 (¶10) (Miss. Ct. App. 2009)).  "Satisfactory familiarity with the specialty of the defendant doctor is, however, required in order for an expert to testify as to the standard of care owed to the plaintiff patient."  *Hubbard v. Wansley*, 954 So. 2d 951, 957 (¶13) (Miss. 2007).

¶39.    In this case, Banks, a general surgeon, testified about the standard of care applicable for the emergency treatment of Foote's vein injury by Graham, a vascular surgeon.  Although the circuit court noted in its findings of fact and conclusions of law that Banks had limited experience in vascular surgery, the circuit court did not exclude Banks as an expert and

allowed him to give opinions concerning the standard of care. We agree that Banks testified that he had extensive experience with repairing vascular injuries during the time of his military service. Even after that experience, because he was the only surgeon in a four-county area, Banks said he often had to treat vascular injuries, especially in trauma situations. Foote's case was an emergency situation that fit within Banks's experience. Even the Hospital did not object to Banks's qualifications (except to note that he was not a *vascular surgeon*), and it did not object to the opinions Banks provided. Given Banks's experience as well as his education and training, Banks was qualified to testify to both the standard of care, breach, and causation elements of Foote's negligence claim against the Hospital.

### B. Causation

¶40. The key issue in this case is whether the circuit court erred in finding that Banks "did not offer any testimony on the issue of proximate cause regarding Plaintiff's claims against [the Hospital]." "Unless the layman's exception applies, the plaintiff must demonstrate through medical-expert testimony that the alleged breach was the proximate cause or the proximate contributing cause of the alleged injuries." *Smith v. Hardy Wilson Mem'l Hosp*., 300 So. 3d 991, 997 (¶16) (Miss. 2020); *Hogan v. Hattiesburg Clinic P.A.,* 374 So. 3d 1264, 1268-69 (¶11) (Miss. Ct. App. 2023); *see also Univ. of Miss. Med. Ctr. v. Lanier*, 97 So. 3d 1197, 1201 (¶15) (Miss. 2012) (In a medical negligence case, causation must generally be proved by expert medical testimony.).

¶41. The Mississippi Supreme Court elaborated that it is not enough to show deviations from the standard of care:

20

the plaintiff must show that there is causation in fact. *Id*. (citing *Trapp v. Cayson*, 471 So. 2d 375, 383 (Miss. 1985)). "Cause in fact means that, but for the defendant's negligence, the injury would not have occurred." *Huynh v. Phillips*, 95 So. 3d 1259, 1263 (Miss. 2012) (citing *Glover ex rel. Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1277 (Miss. 2007)).

*Smith*, 300 So. 3d at 997 (¶17). "Proximate causation is an essential ingredient of a claim of medical negligence." *Hogan*, 374 So. 3d at 1268 (¶10) (citing *Cavalier v. Mem'l Hosp. at Gulfport*, 253 So. 3d 288, 293 (¶17) (Miss. 2018)). "For the proximate-cause element, the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough." *The Univ. of Miss. Med. Ctr. v. Littleton*, 213 So. 3d 525, 535 (¶29) (Miss. Ct. App. 2016).

¶42. In addition to a recovery for damages for injuries directly caused by a physician's negligence, such as Burwell's penetration of the iliac vein, Mississippi law also provides for recovery of damages for missed diagnoses under the legal theory of the "loss of a chance" of recovery. *Mem'l Hosp. at Gulfport v. White*, 170 So. 3d 506, 508-09 (¶11) (Miss. 2015). In that case, White had presented to Memorial Hospital on two occasions with stroke symptoms. *Id*. at 507 (¶¶2, 3). After he was finally diagnosed at another hospital, hospitalized for a month, and spent five months in out-patient therapy, White sued Memorial for failing to diagnose him on the earlier occasions. *Id*. at (¶5). At trial, White presented expert testimony that had he been initially admitted to Memorial and treated, he would have had a reasonable probability—a more than 50% chance—of substantial improvement. *Id*. at (¶7). The trial court found for White, and the defendant appealed. *Id*. at (¶¶7-8). On

21

appeal, the Mississippi Supreme Court recognized this "loss of chance" theory and stated:

> To recover under this theory, the plaintiff must prove that, but for the physician's negligence, he or she had a reasonable probability of a substantial improvement. A plaintiff cannot recover by showing a mere possibility of a "chance of recovery." Stated another way, the plaintiff must offer proof of "a greater than fifty (50) percent chance of a better result than was in fact obtained."

*Id*. at 508-09 (¶11).

¶43. Because Foote pled that Graham's negligence proximately caused or contributed to his injuries and "was a direct and proximate cause of the injuries and complications" Foote experienced, we examine the record for Foote's proof of causation under either theory.

¶44. Our review of Banks's testimony confirms that he was not specifically asked if he had an opinion, to a reasonable degree of medical probability, whether Graham's breach of the standard of care proximately caused or contributed to Foote's injuries. Banks was asked whether he had an opinion "in terms of reasonable medical probability whether or not Mr. Foote was suffering from hypotension of low blood pressure" when pressor drugs were being administered. He was asked to give a "professional opinion, in terms of reasonable medical probability," about Foote's condition at the time he was admitted to PACU. Banks was asked for an opinion, "in terms of reasonable medical probability," whether or not Dr. Graham deviated from the standard of care." Banks also stated, "based upon a reasonable degree of certainty," that Foote should never have been sent to the PACU. However, when asked about "the medical problems caused from the surgery," including the left iliac vein injury, blood loss, blood clot in Foote's artery, anemia, and kidney failure, Banks made the causal link only to Burwell's actions:

22

> Q. I think Dr. Graham has talked about this, and maybe Dr. Burwell, but all of these medications [sic], conditions that we just talked about, that I've talked about with you, that you've testified about, are as a result of the left total hip replacement performed by Dr. Burwell.
>
> A. Yes.

At no time was Banks asked to give an opinion, to a reasonable degree of medical probability, about what, if any, these injuries were caused by Graham's deviation from the standard of care. Nor was Banks asked to give an opinion about whether Foote would have had a better result had Graham operated earlier.

¶45. Foote argues that medical witnesses need not say any magic words when giving their opinions, citing *Daugherty v. Conley*, 906 So. 2d 108, 110 (¶8) (Miss. Ct. App. 2004). In that case, although the United States Supreme Court had stated that the issue of causation "does not turn on the use of a particular form of words by the physicians in giving their testimony," *Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U.S. 107, 109 (1959), we noted that "[t]he Mississippi Supreme Court has stated that testimony in terms of medical probability, rather than possibility, is required by Mississippi law." *Daugherty*, 906 So. 2d 110 (¶8). In *Daugherty*, the issue was whether Mississippi law required expert opinions to be expressed in terms of medical probability or possibility. *Id*. at (¶9). But in the case at hand, the issue is not the words Banks used, but whether Banks rendered any opinion at all on Graham's causation of Foote's injuries.

¶46. In an attempt to find such testimony, Foote points to Banks's testimony that Foote suffered kidney failure after Graham's surgery because Foote had lost so much blood. Banks testified that

23

the cause of the kidney failure is because he had an extended period of time of low blood flow in his body, which then did not supply blood to his kidneys, so they were damaged and they were not functioning because they were full of debris and toxins, and basically the fil- – one of the filtration systems of his body wasn't working because it didn't have blood flow.

While this may provide a clear explanation of the *medical* cause for Foote's kidney failure, Banks did not attribute the extended period of time of low blood flow to any negligence of Graham.

¶47. The dissent posits that causation can be inferred from Banks's testimony that Graham could have done an ultrasound to alert him of the bleeding, and (the dissent adds) the vascular repair would have occurred much earlier. However, Banks never specifically testified that Graham should have performed the vascular repair earlier. Banks said that Graham came to Burwell's operating room:

> And at that point in time, he could have immediately found out if there was bleeding or not [in] a real simple way. Grab an ultrasound machine, put it on Mr. Foote's belly and look. We do that all the time in trauma. It's called a focused assessment of the patient's abdomen with an ultrasound machine. I mean, you guys know, birthing mothers, they look at babies with an ultrasound, put some jelly on the belly and put that on there and look at it. You can look and see if there's bleeding in the belly in this case. Mr. Foote should have never left that operating room.

Although Banks testified that Foot should not have left Burwell's operating room, Banks did not specify what Graham should have done beyond the ultrasound. Nor did Banks identify what injuries Foote later sustained that could have been avoided had Graham rendered that treatment. Yet the dissent, citing *Vanlandingham v. Patton*, 35 So. 3d 1242, 1249 (¶37) (Miss. Ct. App. 2010), in which we stated there is no requirement that an expert use magical language in his testimony "so long as the import of the testimony is apparent," assumes it was

24

apparent Banks felt that Graham should have operated earlier and that his failure to do so caused Foote's injuries. But Banks did not say that Graham should have operated immediately; he only said that Graham failed to do an ultrasound and find the bleed. In *Cleveland Med. Clinic PLLC v. Easley*, 287 So. 3d 1038 (Miss. Ct. App. 2019), we cautioned that "the intent of the law is that if a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can a jury [or fact finder] use that information to reach a decision." *Id*. at 1045 (¶18) (citing *Lanier*, 97 So. 3d at 1203 (¶22)).[4]

---

[4] In *Lanier*, a two-year-old child presented to UMMC with a high fever and was given four times his normal dose of an anti-seizure medication he was taking for his genetic disorder, Chediak-Higashi Syndrome. *Lanier*, 97 So. 3d at 1199 (¶¶3, 4). He became lethargic, had problems breathing, and was rushed to the pediatric intensive care unit where he died. *Id*. UMMC stipulated that it had breached the standard of care, and the only issue at trial was whether the child died from complications from his disease or the overdose. *Id*. at (¶7). The plaintiff's expert testified that because the child's health had deteriorated rapidly after being given the medication, in the doctor's opinion, the drug directly caused his splenic sequestration and ultimate death. *Id*. at 1199 (¶8). The trial court held in favor of Lanier, and UMMC appealed. *Id*. at 1200 (¶11). However, on appeal, the Mississippi Supreme Court focused on the expert's testimony that no one would ever know if the dosage was high enough to kill the child because there was no toxicology report. *Id*. at 1202 (¶21). The Court stated,

> This Court has stated that nothing is absolutely certain in the field of medicine, but the intent of the law is that if a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can a jury use that information to reach a decision. In this case, the trial court judge sat as the sole fact-finder, and was left to speculate whether Darrell died from CHS complications or the increased dosage of topiramate. Because Dr. Galvez's opinion was not based on a reasonable degree of medical probability, this Court finds the testimony was not sufficient to prove causation.

*Id*. If the *Lanier* Court had used the approach urged by the dissent in this case, it likely would have affirmed the trial court's logical conclusion that the overdose of the medication contributed to the child's deteriorating condition and eventual death. But, instead, the Supreme Court still required some medical testimony on causation. *See also Lindsey v. Butts*, 382 So. 3d 1140, 1149 (¶34) (Miss. 2024) ("To prove a medical-negligence case against the

What is "apparent" from Banks's testimony was that Burwell punctured Foote's vein at 9:03 a.m. and that this negligence caused Foote's injuries.

¶48. Foote further argues that if he had presented sufficient proof of causation to withstand the Hospital's Rule 41 motions during trial, not once but twice, then the circuit court clearly erred in finding the proof lacked evidence of causation three years later. However, the denials of the Hospital's Rule 41 motions did not constitute an affirmative ruling on the merits in favor of Foote. In ruling on a Rule 41(b) motion to dismiss, we have held that "the judge must consider the evidence fairly, rather than in the light most favorable to the [nonmovant]" as would be the case on a motion for a directed verdict or a motion for summary judgment. *Floyd v. Tunica County*, 333 So. 3d 864, 873 (¶36) (Miss. Ct. App. 2022) (quoting *Century 21 Deep S. Props. Ltd. v. Corson*, 612 So. 2d 359, 369 (Miss. 1992)). Moreover, a trial court may reconsider interlocutory orders for any reason it deems sufficient. *See Cutrer v. Singing River Health Sys.*, 302 So. 3d 648, 658 (¶36) (Miss. Ct. App. 2020) (stating that "the trial court is free to reconsider and reverse [an interlocutory ruling] for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law"). In Foote's case, the trial court's denials of the motions to dismiss were obviously interlocutory, as the trial court still had to weigh all the evidence and enter a final judgment one way or another as to the Hospital, and a jury still needed to make a determination of liability of parties for purposes of fault allocation. If the

---

Hospital, expert testimony is essential to establish the applicable standard of care, how that standard was disregarded, *and how that failure was a proximate contributing cause to [an individual's injuries.*]"(emphasis added)).

26

circuit court had ruled that the proof had not established causation of Foote's injuries by Graham and that the Hospital had no liability, Burwell would have been deprived of his right to prove otherwise to his fact-finder, the jury, or at least seek a contribution of fault that the jury may have found. Thus, the circuit court's denials of the Hospital's Rule 41 motions were not binding when the court later considered all the evidence and rendered its judgment.

¶49. In this case, we find no error by the circuit court in finding that Foote failed to prove causation in its negligence claim against the Hospital.

**III. Whether the circuit court erred in partially bifurcating the trial.**

¶50. The Hospital, as a public entity under the MTCA, had the right to a bench trial under Mississippi Code Annotated section 11-46-13(1), which provides that "[t]he judge of the appropriate court shall hear and determine, without a jury, any suit filed under the provisions of this chapter." However, private defendants Burwell and AOA, who were sued for common law negligence, were guaranteed the right of a jury trial under Article III, Section 31 of the Mississippi Constitution, which states, "The right of trial by jury shall remain inviolate."[5] When both private and public entities are sued, the court can either sever the action into two trials under Mississippi Rule of Civil Procedure 42(b)[6] or may proceed in a

---

[5] *Wells ex rel. Wells v. Panola County Board of Education*, 645 So. 2d 883, 898 (Miss. 1994), held, "The right to jury trial guaranteed by Section 31 applies only to those cases in which a jury trial was necessary at common law."

[6] Rule 42(b) provides:

Separate Trial. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counter-claim, or third-party claim, or of any separate issue or of any number of claims, cross-claims,

single, bifurcated trial where the judge decides the claims against the public entity, and the jury decides the claims against the private defendants, as did the trial court in *University of Mississippi Medical Center v. Gore*, 40 So. 3d 545 (Miss. 2010). In that case, UMMC surgeons performed a kidney transplant on Gore. *Id*. at 547 (¶4). The transplant was unsuccessful because the donor kidney had a tear in the inner lining of the artery. *Id*. Gore sued UMMC as well as LifeSource, a non-profit organization that coordinated the processing of the donated kidney. *Id*. at 551 (¶23). As a private entity, LifeSource was entitled to a jury trial. *Id*. UMMC filed a motion to submit the issue of its liability to the jury for advisory purposes only, although the jury was not informed of this purpose. *Id*. at 551-52 (¶24). Gore agreed and UMMC participated in all aspects of the trial, including voir dire, the jury instruction conference, and closing arguments. *Id*. The jury returned a verdict in favor of both UMMC and LifeSource. *Id*. The trial court did not follow the advisory verdict with respect to UMMC and, a year after the trial, issued a judgment in favor of Gore. *Id*. at 552 (¶25). On appeal, the Mississippi Supreme Court made no comment on the manner in which the trial was conducted and simply reviewed the evidence to determine if the trial court's judgment was sufficiently supported. *Id*. at 553 (¶29).

¶51. In the case at hand, when the issue of bifurcation was raised, Foote proposed that the court proceed in a single trial, with the court deciding the claims against the Hospital and the jury deciding the claims against Burwell and AOA. The court accepted Foote's proposal.

---

counter-claims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by Section 31 of the Mississippi Constitution of 1890.

Accordingly, Foote's contention now that the circuit court erred in following his suggestion has no merit.

¶52.  Foote also argues that the Hospital should not have been able to participate in all aspects of the partial trial.  After the circuit court decided to bifurcate the trial, there was no further discussion of how involved the Hospital would be in the presentation of the evidence. The court proceeded just as the trial court did in *Gore*, with no objection from Foote when the Hospital questioned the venire during voir dire or presented witnesses, jury instructions, and a closing argument.  "Failure to object to an issue below operates as a waiver of the ability to assert the issue as error on appeal." *Davis-Everett v. Dale*, 926 So. 2d 279, 282 (¶5) (Miss. Ct. App. 2006) (citing *Foley v. State*, 914 So. 2d 677, 689 (¶26) (Miss. 2005)). Accordingly, Foote waived the argument to the extent of the Hospital's participation at trial as an issue on appeal by his failure to object.

**IV.  Whether the circuit court erred in allowing the jury to allocate fault and then finding that the jury's allocation was not supported by substantial evidence.**

¶53.  Foote basically complains that the circuit court did not follow the advice of the jury, which placed 25% liability on the Hospital.  However, because there are two different fact-finders, the possibility exists for two different assessments of the facts.  This occurred in *Gore*, where the judge found liability when the jury did not.  *Gore*, 40 So. 3d at 547 (¶1). The Mississippi Supreme Court did not require that the circuit court follow the advisory verdict of the jury.  Instead, the Court conducted the normal appellate review of a bench trial ruling using established precedent concerning whether the weight of the evidence supported

29

the judge's ruling. *Id.* at 552 (¶28) ("This Court will not disturb a trial court's findings if they are supported by substantial evidence."). Here, the circuit court's findings that Foote had not proved causation were supported by sufficient evidence in the record. The MTCA is clear that cases against public entities **shall** be heard by a judge, without a jury. Miss. Code Ann. § 11-46-13(1) (emphasis added). This statute would clearly be violated should we require the circuit court to follow the jury's opinion. Accordingly, we find no merit to this issue.

## Conclusion

¶54. Although the circuit court may have erroneously relied on Foote's attorney's comments during the closing argument, the error was harmless. The circuit court's judgment dismissing Foote's claim against the Hospital was justified because Foote's expert medical doctor failed to provide testimony that Graham's negligence proximately caused Foote's injury. In addition, we hold that the circuit court properly bifurcated the trial and did not err in allowing the Hospital to fully participate in the jury trial and allocate fault. However, we hold that the circuit court was not bound to accept the portion of fault the jury allocated to the Hospital.

¶55. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McCARTY, WEDDLE AND ST. PÉ, JJ., CONCUR. WILSON, P.J., AND EMFINGER, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**LAWRENCE, J., DISSENTING:**

¶56. I respectfully dissent from the majority opinion for two reasons. First, I disagree with

the majority that the trial court considered "as evidence" remarks made by Foote's attorney during his closing argument. In its "Finding of Fact and Conclusion of Law and Order," the trial court quoted the closing argument by stating:

> During closing argument, Plaintiff's counsel argued to the jury, in part, as follows:
>
>> Back to Dr. Graham. Looking at the records, listening and verifying what's one these records, listening to his testimony – you know, I tried to do what was right as a lawyer, probably 47 years, and I may have been wrong, but I was never in doubt about thinking what I thought was right, and what I think is right is I'm not sure under these circumstances Dr. Graham did anything wrong. That's my honest gut feeling. It's your decision.

Nothing suggests the court relied on this quote "as evidence." Immediately following this quote, the court explained, "Notwithstanding the argument by Plaintiff's counsel," the jury still found the hospital liable. The court was merely explaining that the jury was able to reach its own conclusion regardless of Foote's attorney's statement to the contrary. It is inconceivable to think the long-standing judge with years of experience as a trial judge (and trial attorney before that) could suddenly forget that closing arguments are not evidence. This simple rule of trial practice is respected by every court in this state and relayed to juries in trials in this state. Furthermore, the Mississippi Supreme Court has continuously held that closing arguments are not evidence. *See Henton v. State*, 752 So. 2d 406, 409 (¶11) (Miss. 1999); *Ormond v. State*, 599 So. 2d 951, 961 (Miss.1992); *Russell v. State*, 670 So. 2d 816, 837 (Miss. 1995). While not evidence, closing arguments can certainly be used as a summation of evidence presented and, in some cases, may be considered to relay trial strategy on the issues to be decided by the trier of fact. We routinely listen to lawyers'

31

arguments before this Court, not as new evidence to include in the record but certainly as evidence relevant in understanding the issues lawyers argue on behalf of their clients.

¶57. Second, I disagree with the majority that Foote failed to prove that Dr. Graham "proximately caused or contributed to Foote's injuries (medical causation) through qualified expert testimony." The Mississippi Supreme Court "has held that there is no requirement that an expert use magical language in his testimony, 'as long as the **import of the testimony is apparent.**'" *Vanlandingham v. Patton*, 35 So. 3d 1242, 1249 (¶37) (Miss. Ct. App. 2010) (emphasis added) (quoting *West v. Sanders Clinic for Women P.A.*, 661 So. 2d 714, 720 (Miss.1995)).

¶58. Here, the expert Dr. Banks testified that he was present during Dr. Burwell's and Dr. Graham's testimonies and determined that Dr. Graham "deviated from the standard of care." Dr. Banks explained that Dr. Graham was asked to go to Foote's operating room around 10:02 a.m. and 10:19 a.m. and assess him "for a possible bleeding problem." On cross-examination, Dr. Banks was asked if it was his "assumption . . . that either Dr. Burwell or Dr. Graham knew that the external iliac vein was involved; and the reality is they did not until the vascular procedure was done at 11:30, correct?" Dr. Banks responded, "That's correct." Dr. Banks also testified that once Dr. Graham got to Foote's operating room,

> [Graham] could have immediately found out if there was bleeding or not a real simple way. Grab an ultrasound machine, put it on Mr. Foote's belly and look. We do that all the time in trauma. It's called a focused assessment of the patient's abdomen with an ultrasound machine. . . . **Mr. Foote should have never left that operating room.**

(Emphasis added). There was expert testimony (evidence) that Dr. Graham did not conduct

an ultrasound in the operating room when first called, which caused Foote to continue to lose a large amount of blood "in a very short period of time." Dr. Banks testified Foote "lost a total of 4.5 liters of blood or more." Dr. Banks explained that the cause of Foote's kidney failure was "because he had an extended period of time of low blood flow in his body, which then did not supply blood to his kidneys. . . ."

¶59.   Dr. Banks testified that Dr. Graham's omission of conducting an ultrasound would have alerted him of Foote's bleeding, and the life-saving surgery of vascular repair would have occurred much earlier. Since there is no requirement that an expert use "magical language," and it is readily apparent from the expert's testimony that the amount of blood lost from the venous puncture caused Foote's devastating injuries, any delay attributed to Dr. Graham caused a continuous loss of blood, which caused the major life-threatening injures Foote endured.

¶60.   The trial court's refusal to consider that evidence was error. I fully recognize the trial court is the finder of fact under the Mississippi Tort Claims Act. The MTCA clearly states "the judge of the appropriate court shall hear and determine, without a jury, any suit filed." Miss. Code Ann. § 11-46-13 (Rev. 2019).  As in this instant case, in "a bench trial, the trial judge is 'the jury' for all purposes of resolving issues of fact." *Lindley v. State*, 143 So. 3d 654, 657 (¶11) (Miss. Ct. App. 2014) (quoting *Sendelweck v. State*, 101 So. 3d 734, 738-39 (¶19) (Miss. 2012)). The Court of Appeals, however, is not permitted to assume the role of juror and sit as the thirteenth juror. *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not

33

resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.* Further, we will not reverse the trial court's decision unless that decision is "manifestly wrong or clearly erroneous, or the trial court applied an erroneous legal standard." *Pittman v. Mem'l Hosp. at Gulfport*, 300 So. 3d 1053, 1058 (¶18) (Miss. Ct. App. 2020). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Phillips v. City of Oxford*, 368 So. 3d 317, 323 (¶20) (Miss. 2023).

¶61.    The trial court had the same evidence as the jury. Yet the trial court did not consider it like the jury. The court found:

> Based upon a careful review of Dr. Banks' testimony, this Court finds that Dr. Banks **did not offer any testimony** on the issue of proximate cause regarding Plaintiffs claims against Memorial.

(Emphasis added). The trial court added, "[T]his is a case that begs the question – did Plaintiff offer proof on each and every element of his claim against Memorial, specifically the issue of proximate cause? The answer is a resounding, 'No.'"

¶62.    The jury was instructed:

> [If] [t]he combined breach of the standard of care by both Dr. Dudley Burwell and Dr. Joseph Graham **proximately caused** the injuries suffered by Hunter William Foote, Jr. then you shall return a verdict against both Dr. Dudley Burwell, AOA and Memorial Hospital, through its employee Dr. Joseph Graham.

(Emphasis added). The jury was then asked to fill out the "Jury Interrogatory and Special Verdict Form." The form asked the jury whether "Defendant, Memorial Hospital at Gulfport (by and through Dr. Graham), breached the applicable standard of care on June 5, 2015, as

34

such breach has been defined in other instructions of the Court, [and] do you **find that the breach was a proximate cause of Plaintiff's injuries**?" (Emphasis added). The jury found proximate cause and returned a verdict against Dr. Graham and the Hospital.

¶63.    I do not take issue with the trial court's determination being contrary to the jury's verdict. I take issue with the trial court's finding that no expert testimony was offered as to proximate cause concerning Dr. Graham's clearly articulated breach of duty. Expert testimony showed that Dr. Graham's delay in diagnosing the venous puncture caused Foote to lose blood for a continuous amount of time. Dr. Banks also testified that the loss of blood caused Foote's kidneys to fail. Trial judges, just like juries, are required to consider the evidence offered. The weight and worth of that evidence is for the trial judge (in a bench trial) and jury to decide, not this Court. *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980); *see also Lenoir v. State*, 222 So. 3d 273, 278 (¶25) (Miss. 2017). However, a failure to consider the evidence at all should constitute error. If the trial court considers all the evidence and determines Dr. Graham's negligence, if any, was not the proximate cause of Foote's injuries, then I can accept that determination. But to say there was no evidence, when there was, is a failure to consider all the evidence presented by Foote's expert. Since the trial court did not consider all the evidence in reaching its conclusion, I would reverse the findings of fact and conclusions of law and remand for full consideration.